# **EXHIBIT A**

# **SECOND AMENDED PLAN OF REORGANIZATION**

FILED UNDER SEPARATE COVER
AS ECF DOC. NO. 31

**EXHIBIT B-1**

Form 8041

# CONTRACT OF SALE

WARNING: NO REPRESENTATION IS MADE THAT THIS FORM OF
CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE
COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS
LAW ("PLAIN ENGLISH").

## CONSULT YOUR LAWYER BEFORE SIGNING IT.

NOTE: FIRE AND CASUALTY LOSSES: This contract form does not provide
for what happens in the event of fire or casualty loss before the title closing. Unless
different provision is made in this contract, Section 5-1311 of the General
Obligations Law will apply. One part of that law makes a purchaser responsible for
fire and casualty loss upon taking of title to or possession of the premises.

**Date:**      CONTRACT OF SALE made as of the ~~1st~~ day of ~~September~~, 20 21
             BETWEEN Veterans Road Holdings, LLC          November

**Parties:**   Address: 362 St. Marks Place, Staten Island, New York 10301
             hereinafter called "SELLER," who agrees to sell, and Alpha Equity Group, LLC ,
             William Segal, or an entity to be formed prior to the end of the due diligence period

             Address:  3021 Ave J Brooklyn, NY 1121
             hereinafter called "PURCHASER," who agrees to buy

**Premises:**  The property, including all buildings and improvements thereon (the
             "PREMISES") (more fully described on a separate page marked "Schedule A")
             and also known as:

             Street Address:
             2925-2965 Veterans Road West Staten Island, NY
             Tax Map Designation: Block 7511, Lot(s) 175 and 150, Richmond County
             Together with SELLER'S interest, if any, in streets and unpaid awards as set
             forth in Paragraph 9.

**Personal
Property:**         The sale also includes all fixtures and articles of personal property
             attached to or used in connection with the PREMISES, unless specifically
             excluded below. SELLER states that they are paid for and owned by SELLER
             free and clear of any lien other than the EXISTING MORTGAGE(S). They
             include but are not limited to plumbing, heating, lighting and cooking fixtures,
             ~~bathroom and kitchen cabinets, mantels, door mirrors, venetian blinds, shades,~~
             ~~screens, awnings, storm windows, window boxes, storm doors, mail boxes,~~
             ~~weather vanes, flagpoles, pumps, shrubbery, fencing, outdoor statuary, tool~~
             ~~sheds, dishwashers, washing machines, clothes dryers, garbage disposal units,~~
             ~~ranges, refrigerators, freezers, air conditioning equipment and installations, and~~
             ~~wall-to-wall carpeting.~~

                  Excluded from this sale are: Furniture and household furnishings, plumbing,
             heating, lighting and cooking fixtures, bathroom and kitchen cabinets, mantels, door
             mirrors, venetian blinds, shades, screens, awnings, storm windows, window boxes,
             storm doors, mail boxes, weather vanes, flagpoles, pumps, shrubbery, fencing, outdoor
             statuary, tool sheds, dishwashers, washing machines, clothes dryers, garbage disposal
             units, ranges, refrigerators, freezers, air conditioning equipment and installations,
             wall-to-wall carpeting.

*Stewart Title Insurance Company*

Title Number: ALR 21-2875
Page 1

SCHEDULE A DESCRIPTION

ALL that certain plot, piece or parcel of land, with buildings and improvements thereon erected, situate, lying and being in the Borough of Staten Island and County of Richmond, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the westerly line of Tyrellan Avenue with the southerly line of Veterans Road West and running thence along the said westerly line of Tyrellan Avenue, South 3 degrees 11 minutes 44 seconds West 470.07 feet to a point.

RUNNING THENCE South 85 degrees 57 minutes 30 seconds West, 150.19 feet to a point;

RUNNING THENCE North 86 degrees 59 minutes 02 seconds West 91.37 feet to a point;

RUNNING THENCE along a curve bearing to the right, along a radius 133.00 feet, subtending a central angle of 62 degrees 10 minutes 53 seconds for an arc length 144.34 feet to a point;

RUNNING THENCE North 24 degrees 48 minutes 09 seconds West, 71.62 feet to a point;

RUNNING THENCE along a curve bearing to the left, along a radius 333.00 feet to a point, subtending a central angle of 60 degrees 31 minutes 44 seconds for an arc length of 351.79 feet to a point;

RUNNING THENCE North 85 degrees 19 minutes 53 seconds West 404.99 feet to a point;

RUNNING THENCE North 3 degrees 11 minutes 44 seconds East, 196.33 feet to the southerly line of Veterans Road West;

RUNNING THENCE South 85 degrees 19 minutes 53 seconds East, along the said line of Veterans Road West 1,082.50 feet (1,082.05 feet on the tax map) to the corner of Tyrellan Avenue at the point or place of BEGINNING.

1

*Purchase Price:*

1. a: The purchase price is                                           $      47,000,000.00

   Payable as follows:

   On the signing of this contract, by check subject to
   collection:                                                         $       750,000.00

   Additional deposit paid pursuant to
   Paragraph 2 of Rider                                                $       750,000.00

   By a Purchase Money Note and Mortgage from
   Purchaser (or assigns) to SELLER:                                   $           0.00

   BALANCE AT CLOSING:                                                 $     45,500,000.00

   b. If this sale is subject to an EXISTING MORTGAGE, the Purchase Money Note and Mortgage will also provide that it will remain subject to the prior lien of any EXISTING MORTGAGE even though the EXISTING MORTGAGE is extended or modified in good faith. The Purchase Money Note and Mortgage shall be drawn on the standard form by the attorney for SELLER. PURCHASER shall pay the mortgage recording tax, recording fees and the attorney's fees in the amount of $_____ for its preparation.

   c. If any required payments are made on an EXISTING MORTGAGE between now and CLOSING which reduce the unpaid principal amount of an EXISTING MORTGAGE below the amount shown in Paragraph 2, then the balance of the price payable at CLOSING will be adjusted. SELLER agrees that the amount shown in Paragraph 2 is reasonably correct and that only payments required by the EXISTING MORTGAGE will be made.

   d. If there is a mortgage escrow account that is maintained for the purpose of paying taxes or insurance, etc., SELLER shall assign it to PURCHASER, if it can be assigned. In that event PURCHASER shall pay the amount in the escrow account to SELLER at CLOSING.

*Existing Mortgage(s):*

2. The PREMISES will be conveyed subject to the continuing lien of "EXISTING MORTGAGE(S)" as follows:

   Mortgage now in the unpaid principal amount of $_____ and interest at the rate of _____ percent per year, presently payable in installments of $_____, which include principal, interest, and with any balance of principal being due and payable on _____.

   SELLER hereby states that no EXISTING MORTGAGE contains any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the fact of CLOSING.

*Acceptable Funds:*

3. All money payable under this contract, unless otherwise specified, shall be either:

   a. Cash, but not over one thousand ($1,000.00) Dollars ;

   b. Good certified check of PURCHASER, or official check of any bank, savings bank, trust company, or savings and loan association having a banking office in the State of New York, payable to the order of SELLER, or to the order of PURCHASER and duly endorsed by PURCHASER (if an individual) to the order of SELLER in the presence of SELLER or SELLER'S attorney;

   c. Money other than the purchase price, payable to SELLER at CLOSING, may be, by check of PURCHASER up to the amount of _____One Thousand_____ dollars ($1,000.00         ); or

   d. As otherwise agreed to in writing by SELLER or SELLER'S attorney.

   e) wire of funds

"Subject to" Provisions:

4. The PREMISES are to be transferred subject to:

a. Laws and governmental regulations that affect the use and maintenance of the PREMISES, provided that they are not violated by the buildings and improvements erected on the PREMISES.

*Recorded prior*

b. Consents for the erection of any structures on, under or above any streets on which the PREMISES abut.

c. Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway.

Title Company Approval:

5. SELLER shall give and PURCHASER shall accept such title as any New York State licensed title insurance company *Chosen by Purchaser* will be willing to approve and insure in accordance with the standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

Closing Defined and Form of Deed:

6. "CLOSING" means the settlement of the obligations of SELLER and PURCHASER to each other under this contract, including the payment of the purchase price to SELLER, and the delivery to PURCHASER of a bargain and sale deed with covenants deed in proper statutory form for recording so as to transfer full ownership (fee simple title) to the PREMISES, free of all encumbrances except as herein stated. The deed will contain a covenant by SELLER as required by Section 13 of the Lien Law.

If SELLER is a corporation, it will deliver to PURCHASER at the time of CLOSING (a) a resolution of its Board of Directors authorizing the sale and delivery of the deed; and (b) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that section.

Closing Date and Place:

7. CLOSING will take place ~~at the office of~~ as per rider
at _____ o'clock on _____, 20____.

Broker:

8. PURCHASER hereby states that PURCHASER has not dealt with any broker in connection with this sale other than Cassandra Properties, Inc. and SELLER agrees to pay the broker the commission earned thereby (pursuant to separate agreement).

Streets and Assignment of Unpaid Awards:

9. This sale includes all of SELLER'S ownership and rights, if any, in any land lying in the bed of any street or highway, opened or proposed, in front of or adjoining the PREMISES to the center line thereof. It also includes any right of SELLER to any unpaid award by reason of any taking by condemnation and/or for any damage to the PREMISES by reason of change of grade of any street or highway. SELLER will deliver at no additional cost to PURCHASER, at CLOSING, or thereafter, on demand, any documents which PURCHASER may require to collect the award and damages.

Mortgagee's Certificate or Letter as to Existing Mortgage(s):

10. SELLER agrees to deliver to PURCHASER at CLOSING a certificate dated not more than Three ( 3 ) days before CLOSING signed by the holder of each EXISTING MORTGAGE, in form for recording, certifying the amount of the unpaid principal and interest, date of maturity, and rate of interest. SELLER shall pay the fees for recording such certificate. If the holder of a mortgage is a bank or other institution as defined in Section 274-a, Real Property Law, it may, instead of the certificate, furnish an unqualified letter dated not more than Three ( 3 ) days before CLOSING containing the same information. SELLER hereby states that any EXISTING MORTGAGE will not be in default at the time of CLOSING.

*Seller shall cooperate with Purchaser request for assignment of any Existing Mortgage to Purchaser's lender.*

**Purchaser's Lien:**

19. All money paid on account of this contract, and the reasonable expenses of examination of the title to the PREMISES and of any survey and survey inspection charges are hereby made liens on the PREMISES and collectable out of the PREMISES. Such liens shall not continue after default in performance of the contract by PURCHASER.

*but in t does for a seller default.*

**Seller's Inability to Convey Limitation of Liability:**

20. If SELLER is unable to transfer title to PURCHASER in accordance with this contract, SELLER'S sole liability shall be to refund all money paid on account of this contract, plus all charges made for: (i) examining the title; (ii) any appropriate additional searches made in accordance with this contract; and (iii) survey and survey inspection charges. Upon such refund and payment, this contract shall be considered cancelled, and neither SELLER nor PURCHASER shall have any further rights against the other.

*Subject to Due Diligence Period in Rider*

**Condition of Property:**

21. PURCHASER has inspected the buildings on the PREMISES and the personal property included in this sale and is thoroughly acquainted with their condition. PURCHASER agrees to purchase them "as is" and in their present condition subject to reasonable use, wear, tear and natural deterioration between now and CLOSING. PURCHASER shall have the right, after reasonable notice to SELLER, to inspect them before CLOSING.

**Entire Agreement:**

22. All prior understandings and agreements between SELLER and PURCHASER are merged in this contract. It completely expresses their full agreement. It has been entered into after full investigation, neither party relying upon statements made by anyone else that is not set forth in this contract.

**Changes Must be in Writing:**

23. This contract may not be changed or cancelled except in writing. The contract shall also apply to and bind the distributees, heirs, executors, administrators, successors and assigns of the respective parties. Each of the parties hereby authorize their attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

**Singular Also Means Plural:**

24. Any singular word or term herein shall also be read as in the plural whenever the sense of this contract may require it.

*Continued on addendum or rider attached hereto.*

In Presence Of:

IN WITNESS WHEREOF, this contract has been duly executed by the parties hereto.

Veterans Road Holdings, LLC

By: David Berman, Managing Member

Social Security No./Fed. I.D. No.

Social Security No./Fed. I.D. No.

Alpha Equity Group, LLC

William Segal

46-4733115

or an entity to be formed prior to end of due diligence period

Social Security No./Fed. I.D. No.

Social Security No./Fed. I.D. No.

Attorney for Seller:Mark S. Piazza, Esq.

Attorney for Purchaser: Elliot D. Steinmetz

Address: Jacobi, Sieghardt et.al
235 Forest Ave.
Staten Island, New York 10301
Tel.: (718) 444-600    Fax: (718) 442-9804

Address: Rosenberg & Steinmetz PC
181 South Franklin Avenue, Suite 604
Valley Stream, New York 11581
Tel.: (212) 743-9904    Fax: (212) 743-9916

Closing of title under the within contract is hereby adjourned to _____, 20____, at _____ o'clock at _____; title to be closed and all adjustments to be made as of _____, 20____.

Dated: _____, 20____

For value received, the within contract and all the right, title and interest of the Purchaser thereunder are hereby assigned, transferred and set over unto _____ and said assignee assumes all obligations of the Purchaser thereunder.

Dated: _____, 20____

................................................................
Purchaser

................................................................
Assignee of Purchaser

Rider to Contract of Sale dated the 19th day of ~~October~~, 2021 by and between *November* Veterans Road Holdings, LLC, hereinafter referred to as (the "Seller") and William Segal or an entity to be formed prior to the close of the due diligence period hereinafter referred to as (the "Purchaser");

1.    <u>DUE DILIGENCE PERIOD/PURCHASER'S RIGHT TO CANCEL</u>

A.    Notwithstanding anything to the contrary herein, during the period commencing on the date Purchaser's attorney receives a fully executed Contract of Sale and ending forty five (45) days from said date (the "Investigation Period"), Purchaser shall have the right to conduct any reasonable physical investigation of the premises which Purchaser's desire, provided that (i) such investigations shall be performed at no risk or expense to Seller and (ii) such investigations must not result in any material change in the physical condition of the Premises. In connection therewith, Purchaser and its designees shall be entitled to access to the Premises at all times during the Investigation Period upon twenty-four (24) hours' prior notice to Seller, and Seller shall have the right to accompany Purchaser and/or its designees during any such period of access. Throughout the Investigation Period, Purchaser shall have the right to conduct such investigations as Purchaser, in his sole discretion, may deem appropriate at the Premises, including, without limitation: (i)an environmental study to determine the presence of any hazardous substances on the Premises; (ii) any other feasibility study desired by Purchaser; and (iii) any and all legal engineering, zoning, title, municipal(including, building department)violation searches, hazardous to toxic waste, wetlands studies and environmental studies with respect to the Premises that Purchaser shall deem reasonably necessary. Purchaser shall have the right to terminate this Contract of Sale for any reason or no reason in his sole discretion by delivery of written notice received by Sellers attorney any time prior to the end of the last day of the Investigation Period (such notice may be delivered to Seller's counsel via facsimile at 718-442-9804 or email to mpiazza@lawfirmsi.com), followed by a duplicate notice mailed the same day via certified mail, return receipt requested, or by nationally-recognized overnight courier (with air-bill evidencing date of shipping)or delivered by hand the next day to Seller's attorney. All reports and results of any investigations obtained or conducted by Purchaser regarding the property shall be provided to Seller upon Seller's written request. Upon receipt of such notice by Seller prior to the end of the last day of the Investigation Period, this Contract of Sale shall terminate and Purchaser shall promptly be refunded the Deposit and all interest accrued thereon, if any. Seller shall authorize the real estate broker to provide and cooperate with any and all of Purchasers reasonable request for access to the premises and its environs.

B.    If Purchaser fails to terminate this Contract of Sale by notice delivered to Sellers's attorney prior to the end of the last day of the Investigation Period in accordance with paragraph 1(a), all down payment monies shall be nonrefundable, except upon Seller default or inability to close unless said inability to close is caused by Purchaser, Purchaser shall have no further right to terminate this Contract of Sale, and Purchaser shall accept and Seller shall deliver the Premises "as is" subject to and in accordance with this Contract of Sale.

C.    Purchaser agrees to indemnify, defend and hold Seller harmless from and against any and all losses, claims, costs, or expenses (including, without limitation, reasonable attorneys' fees and disbursements) caused by the acts or omissions of Purchaser and/ or Purchaser's designees, agents and employees at the Premises during the Investigation Period or at any time, including acts and omissions relating to (a) Purchaser's and/ or Purchaser's designees' ,agents' ,and employees' entry upon the Premises, (b) any

inspections, tests or other activities conducted thereon, or (c) any and all

other activities undertaken by Purchaser and/ or Purchaser's designees, agents and employees at the Premises. Nothing contained herein shall be deemed to impose any obligation, responsibility or liability on Purchaser as a result of the imposition of municipal violations or fines against Seller or the Premises imposed directly or indirectly as a result of such investigations, except that Purchaser shall not request an inspection of the Premises by any governmental authority for the purpose of determining whether any violations exist. The provisions of this Section shall survive the Closing or the termination of this Contract of Sale.

D.  In the event Seller requests delivery all reports and results of investigations same shall be deemed property of Seller.

E.  All reports, investigation results and any other information obtained by Purchaser shall be kept confidential and shall not be disclosed to any third parties, governmental authorities or agencies, or any other entity or person.

2.  **ADDITIONAL DOWN PAYMENT**

Within three (3) days of the conclusion of the due diligence period, and in the event Purchaser does not cancel this transaction as set forth in paragraph 1 above, an additional down payment of $750,000.00 shall be due and paid by check or wire of funds subject to collection payable to the Escrowee. Failure to pay this additional down payment shall be deemed a material breach of this contract and Seller shall have the right to terminate same by written notice. Upon termination by the Seller all down payment monies shall be nonrefundable and released to Seller without further notice to Purchaser.

3.  **CLOSING OF TITLE**

Closing of title shall take place at the office of Seller's attorney located at 235 Forest Ave Staten Island, NY 10301 or by escrow through the title company,on or before fifty (50) days from the conclusion of the due diligence period. Notwithstanding anything to the contrary contained herein closing of title must take place prior to December 20, 2021, time being of the essence. In the event Purchaser fails to timely close as set forth above Seller shall have the right to terminate this contract and all down payment monies shall be non-refundable and released to Seller without further notice to Purchaser.

4.  **SECTION 1031 EXCHANGE**

Seller reserves the right to include this transaction as part of an IRC, Section1031 tax deferred exchange for the benefit of Seller, at no cost, expense, or liability to Buyer. Buyer further agrees to execute any and all documents as are usually reasonably necessary in connection upon or subject to the completion of such exchange. Seller agrees to indemnify and hold Buyer free and harmless from any cost, expense or liability, including attorney's fees, resulting from Buyer's participation in such exchange.

5.    **ESCROW**

The down payment hereunder shall be deemed to be paid to Seller by payment thereof to the title company being Riverside Abstract, LLC who will be a signatory to this agreement for the sole purpose of accepting the escrow requirements set forth herein, to be held in escrow , until the earlier of (1) the delivery of the deed hereunder or (2) the earlier termination of this Contract, at which time said escrowee shall remit such down payment to the party then entitled thereto. The escrowee shall act, with respect so such payment as a stakeholder only and without compensation and shall not be liable for the payment of any interest or court costs in any action that may be brought to recover any sums held in escrow, or any part thereof, unless such escrowee shall fail or refuse to pay over any such sums pursuant to a judgment, order or decree that shall be final beyond possibility of appeal, and upon making such payment escrowee shall have no liability to Seller and Purchaser in connection with such deposit. In the event of a dispute among the parties to this agreement or other parties, as to their respective entitlement to the escrow deposit, the escrowee is authorized, upon five days' notice to the parties hereto, to deposit the escrow monies with a court of competent jurisdiction and upon such deposit shall be relieved from further liability and shall be removed as a defendant from any lawsuit brought in connection therewith.

6.    **DEFAULTS AND REMEDIES**

(a) If Purchaser defaults hereunder, Seller shall have the right to avail itself of all remedies available to it.

(b)

If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

7.    **NOTICES**

Any notice or other communication ("Notice") shall be in writing and either;

(a)    sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or;

(b)    delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or

(c)    Each Notice by fax shall be deemed given when transmission is confirmed by the sender's fax machine. A copy

of each Notice sent to a party shall also be sent to the party's attorney. The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries. This contract may be delivered as provided above or by ordinary mail.

8.      **MARKETABLE TITLE**

Purchaser shall order title from a licensed New York State title insurance company within ten (10) days of the date Purchaser's attorney receives a fully executed copy of this contract by email. Written notice of objections to title shall be provided to Seller's attorney within twenty one (21) days of the date Purchaser's attorney receives a fully executed copy of this contract. Failure to timely provide said notice of objections to title shall be deemed a waiver of any objections. Delivery of title report to Seller's attorney shall be considered sufficient notice of any objections to title contained therein. If the Seller shall be unable to convey insurable and marketable title subject to the matters herein excepted and set forth and in accordance with this agreement, the sole obligation of the Seller, except as specifically hereinafter otherwise provided, shall be to refund the Purchaser's down payment made hereunder, together with the actual net expense which the purchaser may have incurred in any title company for the examination of the title, not to exceed the sum of $400.00, and upon the making of such refund and reimbursement this agreement shall wholly cease by reason of this agreement, and the lien, if any, of the Purchaser against the premises shall wholly cease. The Seller shall not be required to bring any action or proceeding or otherwise incur any expenses above $100,000.00 to render the title to the premises marketable or to cure the defects asserted by the Purchaser. The Purchaser may nevertheless accept such title as the Seller may be able to convey with reduction of the purchase price not to exceed $100,000.00 . The acceptance of a deed by the Purchaser shall be deemed to be full performance and discharge of every agreement and obligation on the part of the Seller to be performed pursuant to the provisions of this agreement, except those, if any, which are herein specifically stated to survive the delivery of the deed. If the Purchaser shall assert that the title is subject to defects or objections other than the matters herein excepted and set forth, the Seller shall at its option have the right to request an adjournment of the date herein fixed for delivery of the deed for a period not to exceed sixty (60) days the aggregate as the Seller may require to perfect the title and remove the objections asserted by the Purchaser.

Unpaid liens for taxes, and tax liens and assessments, if any, shall not be objections to the title, except that the Seller agrees that it will pay the same at the closing of title, and the Seller shall have the right to use the proceeds of this sale for such purposes, to the end and that the premises may be acquired by the Purchaser free and clear of such taxes and tax liens.

Notwithstanding anything to the contrary contained herein Seller shall be required to pay any mortgages, liens, judgments and violations caused by it.

9.      **CORPORATION TAXES**
Unpaid franchise tax of New York City General Corporation

Tax of any corporation in the chain of title shall not be an objection to title provided Seller deposits with the title company insuring title a reasonable sum to insure against collection of the same out of the premises.

10.    **ADJUSTMENTS**

All adjustments, including taxes and interest at the maximum rate of interest allowed by law on the unpaid balance of the purchase price shall be as of the date set for closing of title.

11.    **ERRORS AND OMISSIONS**

The parties agree that any arithmetical error made in computation at closing shall be corrected and property adjustments made if written notice thereof is given tot he other party or such party's attorney within30 days after closing, specifying the claimed error.

12.    **"AS IS"**

The Purchaser has examined the premises agreed to be sold and is familiar with the physical condition thereof. The Seller has not made and does not make any representations or warranties as to the physical condition, expenses, operation, maintenance, the use to which the premises may be put, or any other matter or thing affecting or related to the aforesaid premises except as herein specifically set forth, and the Purchaser hereby expressly acknowledges that the Purchaser has inspected the premises and agrees to take the premises "AS IS."

13.    **EXCEPTIONS TO TITLE**

The Premises are sold further subject to the following provided that title is not rendered uninsurable or unmarketable thereby:

(a)    Any state of facts an accurate survey would show so long as same does not affect current use or render title unmarketable or uninsurable.

(b)    Covenants, easements or consents of record, restrictions, zoning plans and regulations, if any affecting the premises, so far as same may now be in force and effect.

(c)    Minor encroachments, extensions, and variations from the record line of hedges, fences, sidewalks, curbs or retaining walls, driveways, stoops, area wells, cellar steps and/or doors, cornices, trim, eaves, gutters and fire escapes, if any upon street or highway and/or record property lines;

(d)    City Planning Commission, Board of Estimate, Zoning Lot, Homeowners and/or Condominium Association, sewage treatment plant/pumping station, and Building Department declarations and/or agreements, etc., provided same do not render title uninsurable;

(e)    Rights of record, if any, acquired by a utility company or municipality to maintain and operate lines, cables poles, boxes and transformers in and over or upon the premises;

(f)    Proposed, adopted or actual street openings and/or street widening and/or upon buildings on the premises.

(g)    Variations minor in nature between the record description herein and

**Compliance with State and Municipal Department Violations and Orders:**

11. a. SELLER will comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted in or issued by any governmental department having authority as to lands, housing, buildings, fire, health and labor conditions affecting the PREMISES at the date hereof. The PREMISES shall be transferred free of them at CLOSING and this provision shall survive CLOSING. SELLER shall furnish PURCHASER with any authorizations necessary to make the searches that could disclose these matters.

**Omit if the Property is not in the City of New York:**

b. All obligations affecting the PREMISES, incurred pursuant to the Administrative Code of the City of New York prior to CLOSING and payable in money shall be discharged by SELLER at CLOSING. This provision shall survive CLOSING.

**Installment Assessment:**

12. If at the time of CLOSING the PREMISES are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and are to be paid by SELLER at CLOSING.

**Apportionments:**

13. The following are to be apportioned as of _____ 12:00 _____ [a.m./p.m.] of the day before CLOSING: (a) Rents as and when collected. (b) Interest on EXISTING MORTGAGE(S). (c) Premiums on existing transferable insurance policies and renewals of those expiring prior to CLOSING. (d) Taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed. (e) Fuel, if any. (f) Vault charges, if any.

If CLOSING shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the old tax rate for the preceding period applied to the latest assessed valuation.

Any errors or omissions in computing apportionments at CLOSING shall be corrected. This provision shall survive CLOSING.

**Water Meter Readings:**

14. If there be a water meter on the PREMISES, SELLER shall furnish a reading to a date not more than 60 ~~Sixty~~ 30 ( ~~60~~ ) days before CLOSING date and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

**Allowance for Unpaid Taxes, etc.:**

15. SELLER has the option to credit PURCHASER as an adjustment of the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than _____ Thirty _____ ( 30 ) business days after CLOSING, provided that official bills therefor computed to said date are produced at CLOSING.

**Use of Purchase Price to Pay Encumbrances:**

16. If there is anything else affecting the sale of which SELLER is obligated to pay and discharge at CLOSING, SELLER may use any portion of the balance of the purchase price to discharge it. As an alternative SELLER may deposit money with the title insurance company employed by PURCHASER and required by it to assure its discharge; but only if the title insurance company will insure PURCHASER'S title clear of the matter or insure against its enforcement out of the PREMISES. Upon request, made within a reasonable time before CLOSING, the PURCHASER agrees to provide separate certified checks as requested to assist in clearing up these matters.

**Affidavit as to Judgments, Bankruptcies Etc.:**

17. If a title examination discloses judgments, bankruptcies or other returns against persons having names the same or similar to that of SELLER, SELLER shall deliver a satisfactory detailed affidavit at CLOSING showing that they are not against SELLER.

**Deed Transfer and Recording Taxes:**

18. At CLOSING, SELLER shall deliver a certified check payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed, together with any required tax return. PURCHASER agrees to duly complete the tax return and to cause the check(s) and the tax return to be delivered to the appropriate officer promptly after CLOSING.

tax map

(h)      Variations minor in nature between the record
property line or lines, fences, walls and/or party walls and
the record tax map; and

(i)      All open New York City Department of Building
permits and/or applications; and

(j)      All violations that are the responsibility of a tenant.

14.       **SELLER'S VIOLATIONS**

In the event at time of closing there are open violations that are the
Seller's responsibility same shall not be an objection to Purchaser
timely  closing. Seller shall, post closing, take all actions necessary
to clear same. Purchaser shall fully cooperate with Seller and sign
all required documents necessary for clearance of any such
violations.

15.       **SELLER REPRESENTATIONS:**

(a)      At closing Seller shall provide executed assignments of
each lease assigning same and the rents payable thereunder to
Purchaser together with executed letters notifying tenants of the
transfer of ownership and security deposits; and

(b) Seller at closing shall provide all original leases and all original tenant
assignments thereof in its possession.

16.       **ESTOPPEL CERTIFICATES:**

Prior to closing Seller shall provide executed estoppel
certificatesfrom all non-national  tenants in the form used
by Seller, a copy of which is attached hereto and made
part hereof. Estoppels will be provided from  National
Tenant's  in  the  form  said  Tenant's  corporate  office
promulgates.

17 .      **MERGER CLAUSE:**

The Contract of Sale and this Rider contain the complete,
full  and  exclusive  understanding  by  and  between
Purchaser and Seller with respect to the transaction
contemplated herein.  Any and all prior oral and/ or
written communications shall be deemed to have been
superseded and replace in their entirety by this Contract of
Sale and this Rider.

18.       **CLOSING EXPENSES and TRANSFER TAXES**

Seller shall pay the New York City Real Property Transfer
Tax and the New York State Real Estate Transfer Transfer
Tax in addition to all other charges and fees required to be
paid by Seller by the terms of this agreement and as
customary under New York practice.

19.       **DOWNPAYMENT**

Upon conclusion of the due diligence period, and in the event

Purchaser does not cancel this transaction as set forth in paragraph 1 above, all down payment monies shall be nonrefundable and deemed the property of Seller except in case of Seller default or inability to close unless said inability to close is caused by Purchaser.

20.    LEASING DURING CONTRACT TERM

The parties agree that Seller shall continue to enter leases at the Shopping Center. Seller shall remain liable for any and all expenses associated with any new leases until the date of the closing. Any monies expended by Seller shall be added back as a direct refund to Seller on a dollar-to-dollar basis at closing. These expenditures shall include but are not limited to, architect, legal, leasing, construction, etc. After closing Purchaser shall assume responsibility for said expenses. The Seller will continue to make leasing decisions with participation from the Purchaser until such time as the additional deposit is made and both deposits are deemed "hard" at the conclusion of the due diligence period.

After the due diligence period has expired, and Purchaser is proceeding with this transaction, no new leases or LOI's shall be signed without Purchaser's written consent, which shall not be unreasonably withheld, except for the following which Purchaser consents to and authorizes and agrees to have included in any price adjustment calculations:

1) Nail Salon - 1,560 SF, $32.00 NNN, CAM $9.75 a foot, 7 months free rent (tenant responsible for build out) $8,233.06 in TA, landlord's work: electrical panel and working HVAC;

2) Asian Cuisine - 3,177 SF, $32.00 NNN, CAM $9.75 a foot, 7 months free rent (tenant is responsible for build out), $16,766.94 in TA, landlord's work: electrical panel, HVAC and installation of bifold store front;

3) Sensational Kids - 4,148 SF, $13.00 NNN, CAM $9.25, $10,000 in TA, 4 months' rent, landlord's work: vanilla box; and

4) Garden State Porcelain - 1,491 SF, $34.00 NNN, $9.75 CAM, 4 months free rent, no TA, landlord's work: vanilla box.

In the event title does not close on or before December 20, 2021 Seller shall have the right to enter into new leases of similar terms and conditions to those set forth above, as well as new leases containing similar terms and conditions in any leases consented to by Purchaser during the period of Purchaser approval set forth herein, without Purchaser's consent.

The Seller shall be entitled to fifteen (15%) percent of the agreed upon cap rate (7%) together with any monies expended by Seller which shall be added back as a direct refund to Seller on a dollar-to-dollar basis at closing a set forth above.  The sum total of any new leases shall be added to the purchase price and the contract amended to reflect same. In the event Purchaser discovers misrepresented or fabricated rent numbers or lease terms Purchaser shall be entitled to a commensurate price reduction calculated by using the formula set forth above

Example: If there was a lease that yielded  100k annually as the net operating income after all costs associated with its pro rata share (taxes, insurance, management, etc.) a 7% yield would be applied  to it to give it a gross value of $1,428,571.43. From there we would subtract the cost to build the space out for

them (as per their lease), the commission paid to the broker for the lease, the concession and rent abatements and ALL costs associated with the landlord requirement for the lease. Assuming all those costs total 400k, we would be left with a net value of $1,028,571.43 for the lease itself. Applying the 15% sharing agreement to the seller we would end at $154,285.71 as the seller's increase in the purchase price for the securement of the lease.

**Veterans Road Holdings LLC New York limited liability company**

By:

_____

**David Berman, Managing Member, Seller**

Alpha Equity Group, LLC

_____

**William Segal, Managing Member, Buyer**

## PURCHASER'S RIDER

1.  Seller shall deliver to Purchaser prior to Closing a written estoppel certificate (and an SNDA if required by Purchaser's lender) from each commercial tenant at the Premises, in the form attached hereto In the event the closing is adjourned Seller will not be required to obtain an additional estoppel certificate from the commercial tenants..

2.  At Closing the following shall be delivered by the Seller:

    (i)     All tenant security deposits and other deposits shall be assigned to Purchaser with credit therefor against sums due at Closing.

    (ii)    a written agreement pursuant to which Seller shall assign to Purchaser, and Purchaser shall assume and agree to be bound by all obligations and liabilities of Seller under the Leases and otherwise with respect to the tenancies of the Premises, in form reasonably satisfactory to Seller and Purchaser, with respect to obligations which arise after Closing, subject to the further terms and conditions of this Agreement

    (iii)   to the extent the same are in Seller's possession or in the possession of Seller's managing agent, Seller shall deliver all original Leases and any amendments or extensions thereto, or true, accurate and correct copies of leases or occupancy agreements. If none exist, then a valid explanation as to why such doesn't exist and the understood terms of such occupancy.

    (ii) A valid certificate of occupancy for the Property.

    (iii) A notice to the tenants of the Property advising the tenants of the sale of the Property and transfer of any unapplied security deposits to Purchaser and directing that all future rents be sent to Purchaser or as Purchaser directs.

    (iv) All keys to and plans and specifications with respect to the Property in Seller's possession or control.

    (v) Seller shall pay or cause to be paid all costs and expenses for the following: (i) Seller's legal fees, (ii) relevant state and city/county transfer taxes and (iii) any and all other expenses (whether incurred prior to or after the Closing Date) as are set forth in this Agreement as Seller's responsibility and/or are incurred in connection with the type of transaction described herein and are typically paid by a seller.

3.  Seller to the best of its knowledge represents and warrants to Purchaser that the following are true and correct in all material respects as of the date hereof:

(a) The Property is currently being used as a retail shopping center with offices and drinking/eating establishments.

(b) To the best of Seller's knowledge, Seller has not received from any governmental authority any notices which have not been corrected or complied with requiring or calling attention to the need for any work, repairs, construction, alteration, or installations on or in connection with the Property, or asserting any violation of any applicable law, regulation, or other governmental requirement beyond what is shown in the public records.

(c) To the best of Seller's knowledge, Seller knows of no claim, litigation or other proceeding pending or threatened against Seller with respect to the Property, or any judgments, decrees or awards outstanding against Seller or the Property except as otherwise set forth herein except for currently pending personal injury actions.

(d) To the best of Seller's knowledge, no condemnation, zoning, or environmental regulation has been instituted or written plans of which has been received by Seller that would detrimentally affect the use, occupancy, or operation of the Property for its current approved purposes.

(e) Seller has full power and authority to enter into and perform this Contract and all documents, instruments and agreements entered into or to be entered into by it pursuant to this Contract and to carry out the transactions contemplated hereby. Seller agrees to provide such documents as Purchaser's title insurer shall reasonably require so as to evidence the right of the party conveying title to Purchaser to do so and for Purchaser to obtain insurable title at prevailing rates. This Contract is, and all documents to be executed by Seller and delivered to Purchaser at the Closing will be on the Closing Date, duly authorized, executed and delivered by Seller to Purchaser the legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms and do not, at the time of Closing will not violate any provisions of any agreement, judicial order or any other thing to which Seller is a party to or by which Seller or the Property is subject or bound. Neither the execution and delivery of this Contract nor the consummation of the transactions contemplated by this Contract is subject to any requirement that Seller obtain any consent, approval or authorization of, or make any declaration or filing with, any governmental authority or third party except as otherwise set forth herein.

(f) There is not now pending, nor to the best of Seller's knowledge without independent inquiry, has there been any action, suit or proceeding against or affecting Seller of the Property before or by any federal or state court, commission, regulatory body, administrative agency or other governmental body, domestic or foreign, wherein an unfavorable ruling, decision or finding may reasonably be expected to have a material adverse effect on the business or prospects of or on the condition or operations of the Property (including the use and development of the Property for the Proposed development), or would interfere with Purchaser's or Seller's ability to consummate the transactions contemplated by this Contract or would in any case or in the aggregate have a material adverse effect, financial or otherwise, on the business or affairs of Seller.

(g) Seller is not a "foreign person" as defined by Internal Revenue Code §1445.

(h) There are no management, service, supply, maintenance or other agreements with respect to or affecting the Property and which would be binding upon Purchaser or the Property after the Closing except for snow removal .

(i) To the best of Seller's knowledge without independent inquiry, the Property is not in violation of any requirement of any building, zoning, environmental, health, safety, use, construction or any other

federal, state or local laws, ordinances, orders, requirements and regulations of any governmental authority having or planning to have jurisdiction over the Property (the "Laws and Regulations") and Seller has not received from anyone any notices or notes of violation (or claimed violations) of any Law or Regulations beyond what is shown in the public records.

G) There is currently pending any appeal with respect to real estate taxes for the Property. Any refunds or benefits received for any period prior to closing shall be credited to and belong to seller.

(k) Seller is solvent; a receiver has not been appointed for Seller or any of his assets or properties; nor is any application for receivership pending with respect to Seller, and no proceedings are pending by or against Seller in bankruptcy, reorganization or any similar law providing for relief of debtors or protection from creditors under any law.

(l) Seller has not entered into any presently effective contracts or agreements regarding the sale, conveyance, transfer or disposition of the Property (except for the within Contract). Seller has not given anyone, and no one possesses any, option to purchase or right of first refusal to purchase the Property.

(m)    There are no employees currently employed by Seller at the Premises who will remain employed following the Closing Date. There are no collective bargaining or union agreements in effect with respect to the Premises.

(n)    To the best of Seller's knowledge, without independent inquiry, any hazardous substances present on, in or under the property shall be those as to be determined by its new environmental consultant as hereinbefore set forth and any information in Seller's control or possession as to the use, generating, processing, storage, release, discharge, transportation, handling or disposing of any hazardous substances on or in connection with the property shall be disclosed to such environmental consultant. The terms "hazardous substances" shall mean and include any and all chemical, substance, material, waste, or component thereof which is now listed, defined or regulated as hazardous or toxic by statute, act, rule, regulation, requirement, order, directive, code or ordinance and all amendment thereto, pertaining in any way to health, safety and/or the environment.

(o) To the best of Seller's knowledge there is no underground oil storage tank on the property.

(p) Seller has received no notice from any insurance company which has issued a policy with respect to the Property or by any board of fire underwriters (or other body exercising similar functions) claiming any defects or deficiencies or requesting the performance of any repairs, alterations or other work, and Seller will promptly notify Purchaser of such notice or requirement if such notice is received prior to Closing.

(q) Seller has received no notice of any (i) assessments or charges for any public improvements have been made against the Property which remain unpaid, (ii) improvements to the Property or any roads or facilities abutting the Property have been made or ordered for which a lien, assessment or charge can be filed or made, or (iii) plans for improvements by any governmental or quasi-governmental authority which might result in a special assessment against the Property

(j) Seller has not received any notice of suspension or cancellation of any certificates of occupancy beyond what is shown in the public records.

(r) Any defective condition, structural or otherwise, in the buildings or other improvements on the

Property, or in the buildings' roof, heating, air conditioning, mechanical, plumbing or electrical systems and equipment of which Seller gains knowledge after the Effective Date shall be disclosed to Purchaser promptly.

(s) To the best of seller's knowledge all public utilities, including but not limited to, sewer, water, electric, gas, telephone, etc. required for the operation of the property, either enter the property thorough adjoining public streets or, if they pass through adjoining private land, do so in accordance with valid easements a shown in the public records; all public utilities have been installed and are operating and all installation and connection charges have been paid for in full. At the time of Closing, Seller shall furnish written assurances to Purchaser that no monies are due the utility companies furnishing water, electricity or sewer tothe property, and that to Seller's best knowledge, there are no restrictions upon such utility companies which would interfere with sewer, water and electricity services.

(t) Seller holds fee simple title to the Property. Seller is a duly existing limited liability company and has the power and authority to enter into this Agreement and to consummate the transactions herein contemplated.

> (u)  No brokerage or leasing commissions, landlord required improvements or construction, or other compensation is or will be due or payable by Purchaser to any person, firm, corporation or other entity with respect to or on account of any of the Leases or any extensions or renewals thereof except as entered into in the ordinary course of business.

> (v)  To the best of Seller's knowledge the Leases and all security deposits, rents and collections are in compliance with law and administrative regulations.

(w) If, during the period between the Effective Date and the Closing Date or earlier termination hereof, any event occurs or condition exists which renders any of the representations contained herein untrue or misleading in any material respect, Seller shall promptly notify Purchaser.

(x) From the date hereof through Closing, Seller shall operate the Property in accordance with the prudent and customary management practices for properties of this type and in compliance with the provisions of this Agreement.

(y) The Certificate of Occupancy delivered to Purchaser is a true copy of the original and such certificate has not been amended or modified in any respect and is sufficient to authorize the current use and physical structure of the Property subject to open DOB permits and applications and to facts shown in the public records. The Property has not been designated as a historical landmark.

(aa) Any mortgage or deed of trust existing against the Property will be satisfied at or before Closing by Seller, or at Purchaser's request assigned to Purchaser's lender if current lender will allow same.

(bb) To the best of Seller's knowledge the Property and the use thereof are in compliance with all applicable laws and governmental regulations, including hazardous materials laws and regulations and subject to facts shown in the public records.

(cc) To the best of Seller's knowledge there are no recorded or unrecorded contracts, agreements (written or oral) and/or options pertaining to or affecting the sale of the property, or any part thereof.

(dd) To the best of Seller's knowledge there are no violations or notices of violations affecting the property (including without limitation, violations or notices of violations with respect to the Americans With Disabilities Act or any lead paint regulations) and Seller has not received any notification from any governmental agency requiring any repairs, replacements or alterations to the property beyond that shown in the public records.


Dated: ~~October~~ November 1, 2021

> **Veterans Road Holdings LLC New York limited liability company**
>
> By: _____
>
> **David Berman, Managing Member, Seller**
>
> Alpha Equity Group, LLC.
>
> _____
>
> William Segal, Member

# EXHIBIT B-2

**THIS ASSIGNMENT OF REAL ESTATE CONTRACT** (this "Assignment") is made and entered into as of the 10th day of January, 2022, by and between **Alpha Equity Group, LLC** a New York limited liability company having a mailing address of 3021 Ave J Brooklyn, NY 11210 ("Assignor"), and **Veteran Holdings NY, LLC.,** having a mailing address at 670 Myrtle Ave #5151, Brooklyn, NY 11205 ("Assignee").

## WITNESSETH:

**WHEREAS,** Alpha Equity Group, LLC as purchaser (the "buyer") has entered into a real estate contract for the purchase of certain real property known as 2925-2965 Veteran Road West Staten Island, NY ("Property") from Veterans road Holdings, LLC as seller (the "Seller"); and

**WHEREAS,** Assignor has attached the Real Estate Contract of Sale as Exhibit "A" to this Assignment; and

**WHEREAS** Assignor has agreed to transfer, set over, assign and convey to Assignee all of Assignor's rights, privileges, duties and obligations in, to and under the Contract

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1. Assignment of Contract. Assignor hereby transfers, sets over, assigns and conveys unto Assignee all of Assignor's rights, privileges, duties and obligations in, to and under the above referenced Contract together with all of Assignor's rights, title and interest in and to the Property as well as all power and privileges conferred by the Contract.

2. Representations and Warranties. Assignor hereby represents and warrants to Assignee (a) that it has full power and authority to assign the Contract to Assignee, (b) that the Contract is in full force and effect and has not been modified or amended in any manner whatsoever and has not been exercised by the Assignor, and (c) all right, title and interest of Assignor in and to the Contract is free and clear of any and all claims, liens and encumbrances whatsoever and that it does warrant and will forever defend the same against the claim or claims of all persons whomsoever.

5. Further Assurances. Assignor covenants with Assignee and Assignee covenants with Assignor that each will execute or procure any additional documents necessary to establish the rights of the other hereunder.

6. Counterparts. This Assignment may be executed by the parties in counterparts, in which event the signature pages thereof shall be combined in order to constitute a single original document.

7. Binding Effect. This Assignment shall be binding upon and inure to the benefit of Assignor, Assignee and their respective successors and assigns.

8. Notices. On or after the execution of this Assignment, all Notices received by the Assignor relating to the Contract or the Real Estate Contract of Sale shall immediately be forwarded to 670 Myrtle Ave #5151, Brooklyn, NY 11205. Upon execution of this Assignment, the Assignor shall inform the Seller of the Assignment, provide a copy of same and direct the

1

seller to provide all Notices relating to the Contract or the Real Estate Contract of Sale to the Assignee hereunder at 670 Myrtle Ave #5151, Brooklyn, NY 11205.

9. <u>Applicable Law.</u> This Assignment shall be construed pursuant to the laws of the State of New York. Any dispute between the parties shall be resolved in a court of competent jurisdiction situate in Kings County, New York.

**IN WITNESS WHEREOF,** the parties have executed this Assignment as of the date set forth above.

Alpha Equity Group, LLC, Assignor

_William J. Segar_

William Segar
Member

Veteran Holdings NY LLC, Assignee

_Pearl Schwartz_

Pearl Schwartz as Manager and as Trustee for
the SOUTH TO EAST 2021 TRUST

## EXHIBIT B-3

# FIRST AMENDMENT TO CONTRACT OF SALE

THIS AMENDMENT TO CONTRACT OF SALE (this "Amendment") is made as of the ___ day of January, 2022 by and between VETERANS ROAD HOLDINGS, LLC, a New York limited liability company (hereinafter referred to as the "Seller") and ALPHA EQUITY GROUP, LLC, a New York limited liability company (hereinafter referred to as the "Purchaser").

RECITALS:

WHEREAS, pursuant to the terms of that certain Contract of Sale dated as of November 20, 2021 (the "Agreement") by and between Seller and Purchaser, Seller has agreed to sell to Purchaser and Purchaser has agreed to purchase from Seller, that certain property known as 2925-2965 Veterans Road West, Staten Island, New York; and

WHEREAS, Seller and Purchaser have agreed to amend the Agreement to address various agreed upon changes in the Agreement by executing this Amendment.

NOW, THEREFORE, in consideration of the premises herein, Seller and Purchaser hereby agree as follows:

1. **Name of Purchaser**. The Purchaser under the Agreement shall be a special purpose entity known as Veteran Holdings NY LLC, a New York limited liability company.

2. The deposit and additional deposit under the Agreement in the aggregate amount of $1,500,000.00 shall be released to Seller upon (i) execution of this Amendment and (ii) execution of a memorandum of contract by both Purchaser and Seller;

3. On January 13, 2022, Seller shall deposit an additional amount of $500,000.00 as part of the deposit under the Agreement to be released to Seller and credited against the purchase price at closing;

4. Simultaneous with the execution of this Agreement, a memorandum of contract shall be executed by both parties and recorded against the Property by Purchaser at Purchaser's sole cost and expense;

5. The Purchaser shall be responsible for all transfer taxes associated with the sale of the Property under the Agreement;

6. The agreement shall be amended to reflect a purchase price of $45,600,000.00

7. The Closing Date under the Agreement shall be amended to be March 1, 2022, time being of the essence;

8. Any news leases must be mutually agreed upon by Purchaser and Seller;

9. **Ratification**. Except as otherwise set forth herein, this Amendment shall not be deemed to modify any term, provision or condition of the Agreement, and the terms, provisions and conditions of the Agreement, as modified hereby, are hereby

reaffirmed, ratified and confirmed, and the Agreement shall continue in full force and effect. The recitals to this Amendment are hereby incorporated as if fully set forth herein at length.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

10. **Counterparts**. This Amendment (i) may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all of which shall together constitute one and the same agreement, and (ii) may be executed by facsimile signatures (or by copies of physically signed documents exchanged via email attachments in PDF format or equivalent).

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

SELLER:

VETERANS ROAD HOLDINGS, LLC

By: _____
    Name: _David Berman_
    Title: Authorized Signatory *mager*

PURCHASER:

ALPHA EQUITY GROUP, LLC

By: _____
    Name: William J. Segal
    Title:  Member

# **EXHIBIT C**

**SECOND AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT
FOR MEMBERSHIP INTERESTS IN
VETERAN HOLDINGS NY LLC**

AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT FOR MEMBERSHIP INTERESTS IN VETERAN HOLDINGS NY LLC (this "**Agreement**") is made as of the 14th day of February 2022, by and among **VETERAN HOLDINGS NY LLC** ("**Debtor**"), **SOUTH TO EAST 2021 TRUST** ("**Seller**"), and **VETERANS ROAD CENTER LLC**, a New York limited liability company ("**Purchaser**").

BACKGROUND

WHEREAS, **DEBTOR** is a debtor in possession in a chapter 11 bankruptcy case before the United States Bankruptcy Court for the Eastern District of New York ("**Bankruptcy Court**"), under Case No. 22-40052 (ESS)("**Bankruptcy Case**") filed on January 18, 2022 ("**Petition Date**"), and subject to the provisions of the United States Bankruptcy Code, 11 U.S.C. §§101 et seq. ("**Bankruptcy Code**"); and

WHEREAS, a CONTRACT OF SALE and FIRST AMENDMENT TO CONTRACT OF SALE (collectively, the "**Veterans Contract**") were entered into prior to the Petition Date between **VETERANS ROAD HOLDINGS LLC** as seller ("**Veterans Seller**"), and the Debtor as purchaser thereunder, covering the purchase and sale of premises known as 2925-2965 Veterans Road, West Staten Island, NY (collectively, the "**Premises**" or "**Property**"); and

WHEREAS, Seller is the holder of 100% of the Membership Interests of the Debtor ("**Membership Interests**"), and the Debtor shall own the Property as of Closing (as hereinafter defined); and

WHEREAS, the Debtor has filed a Plan of Reorganization ("**Plan**"), as may be amended, pursuant to which it will seek to assume the Veterans Contract pursuant to section 365 of the Bankruptcy Code pursuant to which it will, *inter alia,* acquire title to the Premises under its Plan and Purchaser shall contemporaneously acquire new membership interests in the Debtor for the consideration set forth in this Agreement under the terms and conditions set forth in this Agreement and in accordance with the Debtor's Plan, which Plan shall be funded by the Purchase Price (defined herein) and which Purchase Price shall be utilized to fund the Plan Funding Obligations as defined in the Plan with any excess funds over and above the amounts needed to fund the Plan Funding Obligations to be disbursed to Seller whose membership interests in the Debtor shall then be canceled; and

WHEREAS, subject to confirmation of the Plan, the parties are entering into this Agreement for Purchaser to acquire new membership interests in the Debtor in exchange for the Purchase Price, as of the Effective Date of the Plan pursuant to the Plan equal to 100% of the membership interests in the Debtor; and

WHEREAS, as set forth in section 1.1 below, Debtor intends to cancel Seller's Membership Interests and after the distribution to Seller as provided for therein, Purchaser will

own, directly, 100% of the membership interests in the Debtor which will have acquired the Property (as defined below) under the Plan; and

**NOW, THEREFORE**, in consideration of the mutual covenants and representations herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller, Debtor and Purchaser agree as follows:

## ARTICLE 1

## PURCHASE AND SALE

Section 1.1    **Purchase and Sale of Membership Interests**.  Subject to the terms and conditions of this Agreement, Debtor hereby agrees to sell, assign, transfer and convey to Purchaser and Purchaser hereby agrees to acquire from Debtor, at the price and upon and subject to the terms and conditions hereof, 100% of the Debtor's membership interests.

In order to effectuate the transactions contemplated by this Agreement, it is agreed to and understood by the Parties that Purchaser shall fund the Purchase Price for the new membership interests in the Debtor which Purchase Price shall be paid into the Debtor's estate and utilized for the Debtor's acquisition of the Property and to pay the Plan Funding Obligations.  Any excess funds after payment is made in full to satisfy the Plan Funding Obligations shall be distributed to Seller at which time Seller's membership interests in the Debtor shall be canceled and Purchaser shall be the 100% owner of the membership interests in the Debtor.

Section 1.2    **Property**.  By acquiring the membership interests, Purchaser shall acquire all of Seller's indirect right, title and interest in and to the following described property (herein collectively, the "**Property**") which shall be acquired in the name of the Debtor upon assumption of the Contract and the Closing contemplated thereunder and upon confirmation of the Debtor's Plan:

(a)    **Land**.  That certain parcel or parcels of land (the "**Land**") commonly known as 2925-2965 Veterans Road, West Staten Island, NY (the "**Land**").

(b)    **Improvements**. All buildings and improvements and all air and development rights (the "**Improvements**") in and on the Land, together with all other rights ancillary thereto, and other property thereon. The Improvements, Premises, Property, and the Land are collectively referred to in this Agreement as the "**Real Property**".

(c)    **Tenant Leases**. All leases and licenses of space in the Improvements, and all occupancy agreements with respect to space in the Improvements (including amendments, modifications and guarantees in connection therewith, collectively, the "**Tenant Leases**"), and all tenant security deposits under the Tenant Leases (whether cash or in the form of a letter of credit or otherwise) held by Debtor and or Fee Owner on the date hereof (the "**Security Deposits**") and all arrearages of rent as of the Closing Date.

(d)    **Tangible Personal Property**.   All appliances, fixtures, equipment, machinery, furniture, carpet, drapes and other personal property (including plans and specifications, permits and approvals, to the extent assignable), if any, owned or leased by Debtor

{01137963.DOCX;3 }

and located on the Land and the Improvements and used solely in connection therewith (the "**Tangible Personal Property**"); provided that it is expressly agreed by the parties hereto that none of the Tangible Personal Property in, on, around or affixed on or about the Land and the Improvements owned by any party other than Debtor (including, without limitation, by any tenant under a Tenant Lease ("**Tenant**")) shall be or be deemed included in the Property (and shall not be sold pursuant hereto).

(e)    **Contracts**.  To the extent assignable without the consent of third parties and to the extent assumed pursuant to the terms hereof, the Service Contracts.

(f)    **Intangible Property**.  To the extent assignable without the consent of third parties, all intangible property, including, without limitation, the name "American Metro Center" and logos for the American Metro Center, if any (the "**Intangible Property**" together with the Tangible Personal Property (the "**Personal Property**")), if any, owned by Debtor and relating solely to the Land, the Improvements or the Tangible Personal Property (subject to the proviso in Section 1.2(d) of this Agreement).

## ARTICLE 2

## PURCHASE PRICE

Section 2.1    **Purchase Price**.  The purchase price (the "**Purchase Price**") for the Membership Interests shall be **FIFTY-NINE MILLION AND 00/100 DOLLARS ($59,000,000.00)** and shall be paid as follows:

(a)    **Downpayment**. Purchaser has funded an initial deposit of **FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000.00)**, the "**Initial Downpayment**") to **ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**, as escrow agent (the "**Escrow Agent**") by wire transfer of immediately available federal funds.  On or before 5PM EST of February 21, 2022, Purchaser shall make an additional deposit of **ONE MILLION AND 00/100 DOLLARS ($1,000,000.00)** to Escrow Agent (the "**Second Downpayment**" and along with the Initial Downpayment collectively referred to herein as the "**Downpayment**"). The Downpayment shall be held by Escrow Agent in accordance with Article 3 hereof.

(b)    **Independent Consideration**.  The parties hereby acknowledge and agree that a portion of the Downpayment equal to $1,000 (the "**Independent Consideration**") constitutes a payment by Purchaser to Debtor which has been bargained for and agreed to as consideration for Debtor's execution and delivery of this Agreement.  The Independent Consideration is non-refundable in all events, and any return of the Downpayment to Purchaser as expressly provided herein shall be made after deducting the Independent Consideration and paying such Independent Consideration to Debtor.  Notwithstanding the foregoing, the Independent Consideration shall be deemed part of the Downpayment for purposes of crediting the same against the Purchase Price payable by Purchaser at Closing.

(c)    **Closing Payment**.  At the Closing, **FIFTY-SEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($57,500,000.00)**, representing the balance

of the Purchase Price, adjusted as hereinafter provided, shall be paid by wire transfer of immediately available federal funds, to accounts specified in writing by Debtor at a bank or banks designated by Debtor.

**ARTICLE 3**

**DOWNPAYMENT IN ESCROW**

Section 3.1    **Downpayment in Escrow**.  Purchaser shall deliver the Downpayment to Escrow Agent to be held in escrow by Escrow Agent on the following terms and conditions:

(a)    The Downpayment shall be deposited in a non-interest bearing account.

(b)    Escrow Agent shall deliver the Downpayment to Debtor, Seller or to Purchaser, as the case may be, upon the following conditions, subject to Bankruptcy Court approval:

(i)    to Debtor, at the Closing;

(ii)    to Debtor, as liquidated damages upon receipt of written demand therefor signed by Debtor, stating that Purchaser has defaulted in the performance of its obligations under this Agreement and Debtor has terminated this Agreement on account of said default of Purchaser (it being agreed by Purchaser that the Downpayment is a fair and reasonable estimate of Debtor's damages and is not a penalty); provided, however, that Escrow Agent shall not honor such demand until at least five (5) business days after the date on which Escrow Agent shall have delivered a copy of such demand to Purchaser, nor thereafter if during such five (5) business day period Escrow Agent shall have received written notice of objection from Purchaser in accordance with the provisions of this Section 3.1;

(iii)    to Purchaser, upon receipt of written demand therefor signed by Purchaser, stating that:  (1) this Agreement has been duly terminated in accordance with Purchaser's rights under this Agreement and that Purchaser is entitled under this Agreement to the return of the Downpayment; or (2) Debtor has defaulted by failing to consummate the Closing and Purchaser has terminated this Agreement on account of said default of Debtor; provided, however, that Escrow Agent shall not honor such demand in either case until at least five (5) business days after the date on which Escrow Agent shall have delivered a copy of such demand to Debtor, nor thereafter if during such five (5) business day period Escrow Agent shall have received written notice of objection from Debtor in accordance with the provisions of this Section 3.1.

(c)    Upon receipt of a written demand for the Downpayment made by Purchaser Debtor pursuant to subsection (b) of this Section 3.1, Escrow Agent shall promptly deliver a copy thereof to the other party in the manner required herein.  The other party shall have the right to object to the delivery of the Downpayment by written notice of objection given within five (5) business days after Escrow Agent shall have delivered a copy of such demand to such other party, but not thereafter (time being of the essence with respect thereto).  Upon receipt of such notice of

4

objection from the other party, Escrow Agent shall promptly deliver a copy thereof to the party who made the written demand in the manner required herein.

(d)    If: (i) Escrow Agent shall have received a notice of objection as provided for in subsection (c) of this Section 3.1 within the time therein prescribed; or (ii) any other disagreement or dispute shall arise between the parties hereto and/or any other persons resulting in adverse claims and demands being made for the Downpayment (or any part thereof), whether or not litigation has been instituted, then Escrow Agent shall refuse to comply with any claims or demands on it and continue to hold the Downpayment until Escrow Agent receives either:  (x) a written notice signed by Debtor and Purchaser directing the disbursement of the Downpayment; or (y) a final order, which is not (or is no longer) appealable, of the Bankruptcy Court, entered in a proceeding in which Debtor, Purchaser and Escrow Agent are named as parties, directing the disbursement of the Downpayment, in either of which events Escrow Agent shall then disburse the Downpayment in accordance with said direction.  Escrow Agent shall not be or become liable in any way or to any person for its refusal to comply with any such claims or demands unless and until it has received a direction of the nature described in clause (x) or clause (y) of this subsection (d).  Notwithstanding the foregoing provisions of this Section or otherwise, Escrow Agent shall have the following rights:  (1)  if Escrow Agent shall have received a written notice signed by either Debtor or Purchaser advising that a litigation between Debtor and Purchaser over entitlement to the Downpayment has been commenced, Escrow Agent may, on notice to Debtor and Purchaser, deposit the Downpayment with the clerk of the Bankruptcy Court; or (2)  Escrow Agent may, on notice to Debtor and Purchaser, take such affirmative steps as it may, at its option, elect in order to terminate its duties as escrow agent, including, without limitation, the deposit of the Downpayment with the Bankruptcy Court and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Debtor or Purchaser is the losing party.

(e)    Upon the taking by Escrow Agent of any action permitted by this Section 3.1, Escrow Agent shall be released of and from all liability hereunder.  Except as otherwise expressly provided in this Section 3.1, all costs and expenses incurred by Escrow Agent in performing its duties as escrow agent, including, without limitation, reasonable attorneys' fees (either paid to retained attorneys or amounts representing the fair value of legal services rendered to or for itself) shall be borne equally by Debtor and Purchaser.

(f)    Escrow Agent is to act hereunder as a depository only and is not responsible or liable in any manner whatsoever for:  (i) the sufficiency, correctness, genuineness, collection or validity of any instrument deposited with it; (ii) the form of execution of such instruments; (iii) the identity, authority or rights of any person executing or depositing the same; (iv) the terms and conditions of any instrument pursuant to which the parties may act; or (v) the loss of the Downpayment or any interest (due to early presentation for payment, insolvency of the bank in which any portion of the Downpayment is placed or otherwise).

(g)    Escrow Agent shall not have any duties or responsibilities except those set forth in this Section 3.1, and shall not incur any liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper or document believed by Escrow Agent in good faith to be genuine, and Escrow Agent may assume that any person purporting to give it any notice on behalf of any party in accordance with the provisions hereof has been duly authorized to do so. Notwithstanding the foregoing, in order to avoid fraud or other errors, prior to initiating any wire

Escrow Agent shall confirm the wire instructions telephonically with the intended recipient, including all supplemental, conflicting or replacement wire instructions.

(h)     Except to the extent that Escrow Agent shall have been guilty of gross negligence or willful misconduct, Debtor and Purchaser, jointly and severally, agree to defend, indemnify and hold harmless Escrow Agent and its partners and employees from and against any liability whatsoever, and shall promptly pay or reimburse Escrow Agent for all out-of-pocket costs and expenses, including any court costs and reasonable attorneys' fees and disbursements, incurred by it in connection with its performance hereunder.  Escrow Agent shall have no liability hereunder except to the extent that Escrow Agent shall have been found guilty of gross negligence or willful misconduct.

(i)     The terms and provisions of this Section 3.1 shall create no right in any person, firm or corporation other than the parties hereto and their respective successors and assigns, and no third party shall have the right to enforce or benefit from the terms hereof.

(j)     Escrow Agent shall be responsible for the timely filing of any reports or returns required pursuant to the provisions of Section 6045(e) of the Internal Revenue Code of 1986 (and any similar reports or returns required under any state or local laws) in connection with the transactions contemplated by this Agreement.

(k)     Escrow Agent has executed this Agreement for the sole purpose of agreeing to act as such in accordance with the terms of this Section.

## ARTICLE 4

## ACCESS, REPRESENTATIONS AND WARRANTIES

Section 4.1     **Title to the Membership Interests**. The Membership Interests shall be delivered free and clear of any liens and/or encumbrances.

Section 4.2     **Access to the Property.**

(a)     Debtor shall co-operate with Purchaser in causing the Veterans Seller to provide access  to the Improvements for the purpose of, examining the same in anticipation of its acquisition of the Membership Interests in the Debtor and, in the case of any such entry, Purchaser shall: (i) in all events give at least twenty-four (24) hours' advance notice  to Debtor so that Debtor may use its best efforts to arrange for such access and, at their option, have a representative present during each visit to the Property; (ii) not contact or otherwise communicate with any person using, occupying or providing service at the Property, including without limitation, any Tenant, without Debtor's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed, and the right of access herein granted is specifically subject to the rights of Tenants under the Tenant Leases; and (iii) not interfere with the use or operation of the Property.  If Purchaser desires access to any space occupied by a Tenant, Debtor shall seek to arrange such entry, but any access to space occupied pursuant to a Tenant Lease shall be subject to and limited by the terms of the applicable Tenant Lease.  Any such access shall be limited to normal business hours and Purchaser shall  cooperate  with  any  reasonable  request  by  Debtor  or  the  Veterans  Seller  in

connection with the timing of any such access.  Notwithstanding the foregoing, no invasive, intrusive or destructive inspection, testing or soil investigations shall be performed by Purchaser or its representatives or third-party contractors but Debtor, with the consent of the Veterans Seller, may permit Purchaser to perform a "Phase 1" environmental assessment.  Purchaser specifically acknowledges and agrees not to utilize any such access for marketing of all or any part of the Property prior to the Closing.  In the event Purchaser obtains information or discovers a preexisting condition, or state of repair or disrepair, at the Property, Purchaser hereby covenants that it shall not disclose such condition to any person unless Purchaser is required to disclose the discovery of such existing conditions to such person or to a governmental authority pursuant to applicable law (and Purchaser shall promptly notify Debtor of such pending disclosure prior to disclosure thereof and provide Debtor an opportunity to minimize such disclosure, to the extent permitted by applicable law).  Prior to Purchaser's entry on the Property, Purchaser shall furnish (or caused to be furnished) to the Debtor a certificate naming the Debtor, the Seller (and its property manager and lender, but only if the Debtor and Seller make such information available to Purchaser) as additional insureds on Purchaser's or its agent's commercial general liability insurance policy with a company having a BEST rating of A:IX in an amount of at least Two Million Dollars ($2,000,000) per occurrence.  Purchaser agrees to maintain such coverage for so long as this Agreement remains in effect.

(b)     The results of any such inspection (whether evidencing latent or patent defects in the Property or the existence or nonexistence of hazardous materials), or any information or matter discovered by Purchaser relating to the Tenants or the Tenant Leases, economic projections or market studies concerning the Debtor, the Membership Interests, the Property, any development rights, taxes, bonds, covenants, conditions and restrictions affecting the Property, air quality, the utilities serving the Property, any zoning, environmental or building laws, rules or regulations affecting the Property or Membership Interests, the use or occupancy of the Property or any part thereof, the suitability of the Property as the subject of a cooperative or condominium conversion, or otherwise disclosing a condition which is undesirable or in violation of any law or governmental rule, regulation, ordinance or order shall not be grounds for any modification of the respective obligations of Debtor and Purchaser hereunder or for any amendment or modification of this Agreement.  In no event may Purchaser elect to purchase the Property separate from the Membership Interests.

(c)     All: (i) information or materials provided by Debtor to Purchaser; (ii) materials and analyses, compilations, studies or other documents or records prepared by Purchaser or its members, directors, officers, employees, agents, contractors, representatives, affiliates, actual or prospective lenders, accountants, counsel, professional advisers, actual or prospective partners or actual or prospective joint venturers (collectively, the "**Purchaser Representatives**") to the extent such analyses, compilations, studies or other documents or records contain or otherwise reflect or are generated from such information or materials provided by Debtor; and (iii) information obtained by Purchaser relating to the Property in writing from third parties in the course of Purchaser's review, including, without limitation, any environmental assessment or audit (all of the items identified in clauses (ii) and (iii) hereof being hereinafter sometimes collectively referred to as the "**Reports**" and all of the items identified in clauses (i), (ii) and (iii) hereof being hereinafter sometimes collectively referred to as the "**Information**") shall be treated as confidential information by Purchaser.  Purchaser hereby agrees that the Information shall be used solely for the purpose of evaluating the transactions contemplated by this Agreement, and

{01137963.DOCX;3 }

Purchaser shall not disclose or distribute, either orally or in writing, or otherwise duplicate or make available, any of the Information except to Purchaser Representatives for purposes of evaluating the transactions contemplated by this Agreement, and Purchaser shall instruct all Purchaser Representatives as to the confidentiality of all such information.  Upon the termination of this Agreement, Purchaser shall, as directed by Debtor, either promptly destroy all Information (including all originals and copies thereof) or promptly return all Information (including all originals and copies thereof) to Debtor.  This Section 4.2(c) shall survive the termination of this Agreement.

(d)     At Debtor's request, Purchaser agrees to deliver to such Debtor copies of all of the Reports when Purchaser first receives the same.  Purchaser's obligation to deliver the Reports to Debtor shall survive the termination of this Agreement for a period of 20 days.

Section 4.3     **Purchaser's Representations and Warranties**.  Purchaser represents and warrants to Debtor that:

(a)     **Authorization**.  Purchaser is a New York limited liability company, duly organized, validly existing and in good standing under the laws of the State of New York and qualified to do business in the State of Florida and has the requisite power and authority to enter into, execute and deliver this Agreement and to perform all duties and obligations imposed upon it hereunder, and Purchaser has obtained all necessary limited liability company authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and has obtained the consent of all entities and parties necessary to bind Purchaser to this Agreement.  This Agreement is valid, binding and enforceable against Purchaser.

(b)     **No Conflicts**.  Neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of: (i) any organizational documents of Purchaser; (ii) any of the terms, conditions or provisions of any agreement or instrument to which Purchaser, or any member of Purchaser is a party or by which Purchaser, any related entity or affiliate of Purchaser or any of Purchaser's assets is bound; or (iii) any judgment, order, injunction, decree, regulation or ruling of any court or governmental entity in force as of the date hereof or as of the date of Closing.

(c)     **ERISA**.  With respect to each source of funds to be used by Purchaser to purchase the Membership Interests (respectively a "**Source**"), at least one of the following statements shall be accurate as of the Closing Date: (i) the Source does not include the assets of: (x) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), which is subject to Title I of ERISA: or (y) a "plan" as defined in Section 4975(a) of the Internal Revenue Code of 1986, as amended ("**Code**"); or (ii) the Source includes the assets of: (x) an "employee benefit plan" as defined in Section 3(3) of ERISA; or (y) a "plan" as defined in Section 4975 of the Code (each of which has been identified to Debtor in writing pursuant to this Section 4.3(c) at least five (5) business days prior to the Closing Date), but the use of such Source to purchase the Membership Interests will not result in a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

{01137963.DOCX;3 }                                  8

(d)    **No Litigation**.  There are no legal actions, suits or similar proceedings pending against Purchaser, to Purchaser's knowledge, which if adversely determined, would adversely affect Purchaser's ability to consummate the transactions contemplated by this Agreement.

(e)    **Bankruptcy**.  Purchaser has not: (i) commenced a voluntary case, or had entered against it a petition, for relief under the federal bankruptcy code or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors; (ii) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceedings, to hold, administer and/or liquidate all or any of its property; or (iii) made an assignment for the benefit of creditors.

(f)    **Compliance with International Trade Control Laws and OFAC Regulations**.    Neither Purchaser nor any Person (as defined below) who owns an interest in Purchaser (collectively, a "**Purchaser Party**") is now nor at any time prior to or at the Closing will be, an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "**Person**") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "**U.S. Person**") including, without limitation, a "financial institution" as defined in 31 U.S.C. 5312 (a)(z), as periodically amended ("**Financial Institution**"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders or lists published by the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC) or otherwise.

(g)    **Purchaser's Funds**.  Purchaser has taken, and shall continue to take until the Closing, such measures as are required by applicable law to ensure that the funds used to pay to the Debtor the Purchase Price are derived: (i) from transactions that do not violate United States law and, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(h)    **Anti-Money Laundering Laws**.  Neither Purchaser nor any Purchaser Party, nor any Person providing funds to Purchaser: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti Money Laundering Laws (as hereinafter defined in this Section); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws.  For purposes of this Subsection (h), the term "**Anti-Money**

**Laundering Laws**" shall mean all applicable laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "**Patriot Act**"), the Bank Secrecy Act of 1970, as amended, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

(i)    **Purchaser Compliance with Patriot Act**.  Purchaser is in compliance with any and all applicable provisions of the Patriot Act.

(j)    **Cooperation with Debtor**.  For a period of two (2) years after the Closing Date, Purchaser agrees to cooperate with Debtor, and to cause each Purchaser Party to cooperate with Debtor, in providing such additional information and documentation on Purchaser's and each Purchaser Party's legal or beneficial ownership, policies, procedures (to the extent required by applicable laws) and sources of funds as Debtor deem reasonably necessary or prudent to enable Debtor to comply with OFAC, the Patriot Act and Anti-Money Laundering Laws now in existence or hereafter enacted or amended.

Purchaser's representations, warranties and agreements set forth in this Agreement shall survive the Closing or termination of this Agreement for the Survival Period (hereinafter defined).  Purchaser hereby acknowledges and agrees that it is a requirement of this Agreement and a condition to each Debtor's obligations hereunder that all of Purchaser's representations and warranties contained herein shall be true and correct on the date hereof and remain true and correct through and including the Closing Date, and that any material inaccuracy in Purchaser's representations and warranties and/or Purchaser's failure to notify Debtor prior to the Closing Date of any inaccuracies therein shall be defaults by Purchaser under this Agreement.

Section 4.4    **Debtor Representations and Warranties**.  Except as set forth below, Debtor represents and warrants to Purchaser on the date hereof and as of Closing that:

(a)    **Authorizations**.

(i)    Debtor represents and warrants to Purchaser that it is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New York, and, subject to Bankruptcy Court approval, has the requisite power and authority to enter into and deliver this Agreement and, subject to Bankruptcy Court approval, has, or will have by Closing, the requisite power and authority to perform all duties and obligations imposed upon it hereunder, and has obtained all necessary corporate authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and to bind Debtor to this Agreement.  Upon entry of the Confirmation Order, this Agreement is valid, binding and enforceable against Debtor.

(b)     Membership Interests.

(i)     The Membership Interests constitute all of the issued and outstanding equity securities of Debtor. The Membership Interests have been duly authorized and are validly issued, fully paid and nonassessable and have not been issued and were not issued in violation of any preemptive or other similar right.  There are no subscriptions, options, warrants, calls, commitments, preemptive rights or other rights of any kind (absolute, contingent or otherwise) relating to the issuance, purchase or receipt of, nor are there any equity securities or equity interests or instruments of any kind convertible into or exchangeable for, any equity securities or interests (including outstanding, authorized but unissued, unauthorized, treasury or other interests thereof) or other equity interest or any debt security or instrument of Debtor.  There are no outstanding or authorized membership interest appreciation, phantom interests, profit participation or other equity based compensation or similar rights with respect to Debtor, and there are no restrictions upon, or voting trusts, proxies or other agreements or understandings of any kind with respect to, the voting, purchase redemption, acquisition or transfer of, or the declaration or payment of an dividend or distribution on, the equity interest of Debtor.

(ii)     Debtor and Seller have or will at Closing have good and valid title to, and hold of record and own beneficially, the Membership Interests and have marketable and insurable fee simple title to the Property via its ownership structure as set forth in the Recitals herein, which Recitals are true and correct.  On the Closing Date, upon the payment of the Purchase Price and the satisfaction in full of all obligations and conditions precedent to Closing as set forth herein, Debtor will transfer title to the Membership Interests to Purchaser, and Purchaser will be entitled to all rights of a holder of the Membership Interests.  Debtor has the right to issue Membership Interests to the Purchaser, as contemplated hereby and, other than this Agreement, Debtor is not party to any option, warrant, purchase right or other contract or commitment that could require Debtor to sell, transfer or otherwise dispose of the Membership Interests.

(c)     **No Conflicts**.  Neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of: (i) any organizational documents of each Debtor; (ii) any of the terms, conditions or provisions of any agreement or instrument to which each Debtor, or any direct member of each Debtor is a party or by which each Debtor or any of each Debtor's assets is bound; or (iii) any judgment, order, injunction, decree, regulation or ruling of any court or governmental entity.

(d)     **Litigation**.  There are no legal actions, suits or similar proceedings pending against Debtor, or to Debtor's knowledge, threatened in writing against Debtor, which if adversely determined, would materially and adversely affect each Debtor's ability to convey the Membership Interests in accordance with the terms hereof.

(e)     **FIRPTA**.  Debtor is not a "foreign person" or "foreign corporation" as those terms are defined in the Code and the regulations promulgated thereunder.

(f)     Intentionally Omitted.

(g)      **Debtor's Compliance with Patriot Act**.  To Debtor's knowledge, such Debtor has not violated any applicable provision of the Patriot Act.

(h)      **Compliance with Laws**.  Debtor represents and warrants to Purchaser that, as of the date hereof, it has received no written notice of any violation of law that has not been resolved in accordance with applicable law.

(i)      Debtor has not entered into and shall not enter into any solar power purchase agreements or similar instruments relating to the Property.

(j)      To the best of Debtor's knowledge, no person, firm or corporation or other entity has any right or option to acquire the subject Property or any portion thereof or any interest therein.

Section 4.5      **Certain Limitations on Each Debtor's Representations and Warranties**.  The representations and warranties of Debtor set forth in this Agreement are subject to the following express limitations:

(a)      **Tenant Leases and Service Contracts**.  Neither Debtor nor any other party represents or warrants that: (i) any particular Tenant Lease or Service Contract will be in force or effect as of the Closing; or (ii) the Tenants and the counter-parties to the Service Contracts will not be in default under their respective Tenant Leases or Service Contracts as of the Closing Date. The termination or expiration of any Tenant Lease or Service Contract or a default by a Tenant or service provider under any Tenant Lease or Service Contract, respectively, shall not affect the obligation of Purchaser under this Agreement.

(b)      **Documents and Materials**.  To the extent Debtor has delivered or made available to Purchaser copies of those certain documents and other materials specifically identified and scheduled on the Exhibits attached to this Agreement and such documents and other materials contain provisions inconsistent with the representations and warranties made herein, then such representations and warranties shall be deemed modified to conform them to the provisions of such documents and materials.

Section 4.7      **Survival of Representations and Warranties; Specific Limitation**.  The representations and warranties of Debtor set forth in this Agreement and/or in any document delivered by Debtor at Closing (including, without limitation, any Landlord Estoppel Certificate) shall survive the Closing for a period of twelve (12) months (the "**Survival Period**").

Section 4.8      **Disclaimers.**

(a)      **General and Specific Disclaimers**.  PURCHASER ACKNOWLEDGES AND AGREES THAT EXCEPT AS SET FORTH HEREIN OR IN THE DOCUMENTS DELIVERED AT CLOSING, SELLER AND DEBTOR (COLLECTIVELY, THE "**SELLER PARTIES**") HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO: (I) THE VALUE, NATURE, QUALITY

{01137963.DOCX;3 }

OR, EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY; (II) THE INCOME TO BE DERIVED FROM THE PROPERTY; (III) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON; (IV) EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (V) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (VI) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (VII) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; OR (VIII) EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS; OR ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF THE SELLER PARTIES IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF THE SELLER PARTIES SHALL BE VALID OR BINDING UPON ANY OF THE SELLER PARTIES UNLESS EXPRESSLY SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY THE SELLER PARTIES AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST THE SELLER PARTIES (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT THE SELLER PARTIES HAVE NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKE NO REPRESENTATIONS, AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. THE SELLER PARTIES ARE NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE "AS IS" AND WITH ALL FAULTS (INCLUDING

EXPRESSLY, BUT WITHOUT LIMITATION, THOSE RELATING TO THE FAÇADE OF THE BUILDING ON THE LAND).  IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING.  PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE AND HOLD HARMLESS THE SELLER PARTIES FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES, EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF PURCHASER'S ACQUISITION, OWNERSHIP, LEASING, USE, OPERATION, REPAIR, MAINTENANCE AND MANAGEMENT OF THE PROPERTY.

## ARTICLE 5

## CLOSING

Section 5.1    **Closing**.

(a)    The closing (the "**Closing**") shall take place on or before March 14, 2022, **TIME BEING OF THE ESSENCE**, at 10:00 am EST at the offices of the attorney for Veterans Seller at 235 Forest Avenue, Staten Island, NY 10301, or via mail-away escrow through the title company (this date is herein referred to as the "**Scheduled Closing Date**"; the actual date of the Closing is herein referred to as the "**Closing Date**").

(b)    Notwithstanding the foregoing, Purchaser shall be obligated to close on the Membership Interests immediately before or simultaneously with the closing contemplated under the Veterans Contract.

Section 5.2    **Possession**.  Possession of the Membership Interests shall be delivered to Purchaser at the Closing.

Section 5.3    **Intentionally Omitted**.

Section 5.4    **Closing Costs**.

(a)    **Purchaser's Costs**.  Purchaser shall pay: (i) the costs of its counsel, architects, engineers and other professionals and consultants; (ii) any and all recording and filing fees other than those, if any, relating to the satisfaction of Mandatory Liens; (iii) the costs of the Title Commitment, title insurance policy and any endorsements thereto to be issued at the Closing and one-half of Escrow Agent's fee; (iv) the cost of obtaining any survey or updated survey of the Property and any certifications thereto; (v) all costs and expenses in obtaining any financing which Purchaser may obtain in connection with its acquisition of the Membership Interests (it being understood, however, that there is no financing contingency to this transaction, and Purchaser seeks financing at its own risk); (vi) any fees, costs and expenses incurred by Purchaser and/or Debtor in connection with the assumption by Purchaser of any loan or other financing secured by the Property; and (ix) any other costs customarily paid by purchasers of membership interests.

(b)      **Seller's Costs**.   Seller shall pay: (i) the costs of its counsel and other professionals and consultants; (ii) one-half of Escrow Agent's fee, (iii) any other costs customarily paid by Seller of membership interests or as otherwise set forth in this Agreement.

(c)      **Survival**.  The provisions of this Section 5.4 shall survive the Closing.

Section 5.5      **Debtor Obligations at the Closing**. At the Closing, or at such other time as is indicated below, Debtor shall deliver to Purchaser or, at Purchaser's discretion, to the Title Company, the following (collectively, the "**Debtor Closing Documents**"):

(a)      FIRPTA Certification.   A certificate in the form attached hereto as with respect to compliance with the Foreign Investment in Real Property Tax Act (Internal Revenue Code Sec. 1445, as amended, and the regulations issued thereunder).

(b)      Intentionally Omitted.

(c)      Intentionally Omitted.

(d)      Keys.   To the extent in a Debtor's possession or the possession of the property manager, all keys, codes and other security devices for the Property.

(e)      Original Documents.   To the extent available, the originals (to the extent in each Debtor's possession or the possession of the property manager) or, if originals are unavailable, certified copies, of the Tenant Leases, the Service Contracts, and copies of plans and specifications for the Improvements, permits, licenses and other agreements and approvals relating to the maintenance and operation of the Property.   In addition, Debtor or the property manager shall deliver to Purchaser copies of all Tenant files and correspondence with tenants in its possession or control and all other books, records and materials in the possession of Debtor or the property manager reasonably required for the orderly transition of operation of the Improvements.

(f)      Security Deposits.

(i)      if any Security Deposit is being held by Debtor in immediately available funds, then, at the Closing, Debtor shall credit to the account of Purchaser the amount of such Security Deposits (to the extent such Security Deposits have not been applied in accordance with Debtor's rights under the applicable Tenant Lease); and

(g)      Certificate of Representations and Warranties.   A certification of Debtor reaffirming that all representations and warranties made by Debtor in this Agreement are true and correct as of the Closing Date in all material respects (except for those representations and warranties expressly made as of the date hereof), subject to Section 4.5 and Section 4.6 of this Agreement.

(h)      Intentionally Omitted.

(i)      Settlement Statement.   A settlement statement setting forth the apportionments pursuant to the terms of this Agreement (the "**Settlement Statement**").

(j)    <u>Other Documents</u>.  Any other documents which Debtor is obligated to deliver to Purchaser pursuant to this Agreement or are necessary to consummate the transaction contemplated in this Agreement or reasonably requested by the Title Company, including, without limitation, a title affidavit in the form reasonably required by the Title Company.

Location at the Improvements on the Closing Date of any of the materials referred to in Section 5.5(f) shall be deemed delivery to Purchaser.  At Closing, Debtor shall also deliver to the Title Company such organizational and authorizing documents of Debtor, or a Bankruptcy Court order providing requisite authority as shall be reasonably required by the Title Company to evidence Debtor's authority to consummate the transactions contemplated by this Agreement.

Section 5.6    **Purchaser's Obligations at the Closing**.  At the Closing, Purchaser shall deliver to Debtor or, at each Debtor's discretion, to the Title Company, the following (collectively, the "**Purchaser's Closing Documents**"), each of which must be satisfied or waived by Debtor as a condition to each Debtor's obligation to close:

(a)    <u>Purchase Price</u>.  The balance of the Purchase Price in accordance with Section 2.1.

(b)    <u>Certificate of Representations and Warranties</u>.  A certificate of Purchaser certifying that the representations and warranties made by Purchaser in this Agreement are true and correct in all material respects as of the Closing Date.

(c)    <u>Transfer Tax Forms</u>.  Intentionally Omitted.

(d)    <u>Settlement Statement</u>.  The Settlement Statement.

(e)    <u>Other Documents</u>.  Any other documents which Purchaser is obligated to deliver to Debtor pursuant to this Agreement or are reasonably necessary to consummate the transaction contemplated by this Agreement.

At Closing Purchaser shall also deliver to the Title Company such organizational and authorizing documents of Purchaser as shall be reasonably required by the Title Company authorizing Purchaser's acquisition of the Membership Interests and, indirectly, the Property, pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

## ARTICLE 6

## <u>INTENTIONALLY OMITTED</u>

## ARTICLE 7

## <u>DEFAULT</u>

Section 7.1    **Breach by Debtor**.   In the event that Debtorr shall default under this Agreement for any reason except Purchaser's default or as otherwise permitted by this Agreement, Purchaser, as its sole and exclusive remedy may either: (a) terminate this Agreement and, subject to Bankruptcy Court approval, receive a refund of the Downpayment, and neither party shall have any further rights or obligations hereunder other than the Surviving Obligations; or (b) pursue the remedy of specific performance of each of Debtor's obligations under this Agreement; provided, however, that  any such suit for specific performance is filed no later than one hundred twenty (120) days after the Closing Date. Notwithstanding the foregoing, in the event specific performance is not an available remedy to Purchaser due to the acts or omissions of Debtor, then Purchaser shall be entitled to pursue any and all available remedies under law and equity.  Nothing in this Section 7.1 shall be deemed to limit or inhibit Purchaser's ability to sue Debtor post-Closing for breach of Debtor's representations made herein and obtain damages in connection therewith.

**Breach by Purchaser**.  In the event that Purchaser shall default by failing to consummate the Closing of this Agreement in accordance with the terms hereof, for any reason except a Debtor default or as otherwise permitted by this Agreement, Debtor may terminate this Agreement and thereupon Debtor shall be entitled to the Downpayment as liquidated damages (and not as a penalty) and as Debtor's sole and exclusive remedy and relief for such default except with respect to the Surviving Obligations.  Debtor and Purchaser each acknowledge and agree that they have made this provision for liquidated damages because it would be difficult to calculate, on the date hereof, the amount of actual damages for such default, and Debtor and Purchaser agree that these sums represent reasonable compensation to Debtor for such default.  In no event whatsoever shall Purchaser be liable to Debtor for any punitive, special, consequential or other damages.

Section 7.2    **No Right to Eliminate Membership Interests**.  Purchaser acknowledges that Purchaser shall have no right to acquire less than all of the Membership Interests.

## ARTICLE 8

## INTENTIONALLY OMITTED.

## ARTICLE 9

## MISCELLANEOUS

Section 9.1    **Notices**.  All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be given (i) by hand, overnight courier or certified or registered mail, return receipt requested and shall be deemed given when received or when delivery first fails or is refused when sent to the address set forth herein, or (ii) by email (with a copy sent the same day by overnight delivery service or personal delivery), in which case notice shall be deemed given on the date sent if sent by 5:00 p.m. of the recipient's business day (otherwise it shall be deemed received on the next business day), to the appropriate address indicated below or at such other place or places as either Purchaser or Debtor may, from time to time, respectively, designate in a written notice given to the other in the manner described above. For purposes of this Section 9.1, the addresses of the parties for all notices are as follows (unless

changed by similar notice in writing given by the particular person whose address is to be changed):

        If to Seller:

                                      Abraham Neuhaus, Esq.
                                      The Law Office Of Abraham Neuhaus LLC
                                      124 Benjamin Street
                                      Toms River, New Jersey 08755
                                      Phone: (845) 548-7284
                                      Email: abeneuhausesq@gmail.com

        If to Purchaser:        Samuel Lowinger, Esq.
                                      Nussbaum Lowinger LLP
                                      225 Broadway, 39th Floor
                                      New York, NY 10007
                                      Phone: (212) 632-8300
                                      Email: slowinger@nlllp.com

        If to Escrow Agent:        Robinson Brog PC
                                      875 Third Avenue, 9th Floor
                                      New York, New York 10022
                                      Attn: Fred B Ringel
                                      Telephone: (212) 603-6301
                                      E-Mail:  fbr@robinsonbrog.com

The attorneys for each party hereto are authorized to give notices on behalf of such party.

Section 9.2    **Real Estate Commissions**.  Each of Debtor and Purchaser represents and warrants to the other that it has dealt with no broker or other intermediary in connection with this transaction other than NONE (the "**Broker**").  Debtor shall pay the commissions owed to the Broker pursuant to a separate agreement.  Purchaser agrees to indemnify, defend and hold harmless Debtor from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by Purchaser or on Purchaser's behalf with any broker or finder in connection with this Agreement or the transaction contemplated hereby.  Debtor agrees to indemnify, defend and hold harmless Purchaser from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by Debtor or on Debtor's behalf with any broker or finder in connection with this Agreement or the transaction contemplated hereby.  This Section 9.2 shall survive the Closing or any earlier termination of this Agreement.

{01137963.DOCX;3 }

Section 9.3 **Entire Agreement**. This Agreement embodies the entire agreement between the parties hereto relative to the subject matter hereof, and except for Purchaser's obligations and liabilities under any confidentiality agreement executed by or on behalf of Purchaser or any affiliate of Purchaser, there are no oral or written agreements between the parties hereto nor any representations made by either party relative to the subject matter hereof, which are not expressly set forth herein.

Section 9.4 **Amendment**. This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

Section 9.5 **Headings**. The captions and headings used in this Agreement are for convenience only and do not in any way limit, amplify or otherwise modify the provisions of this Agreement.

Section 9.6 **Dates and Timing**. If the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday, legal holiday under the laws of the United States or the State of New York, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday, legal holiday or Jewish holiday.

Section 9.7 **Governing Law**.

(a) This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to a contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof.

(b) Debtor, Purchaser and Seller each irrevocably submit to the exclusive in personam jurisdiction of any State of New York, or Federal court sitting in the City of New York over any suit, action or proceeding arising out of or relating to this Agreement. To the fullest extent it may effectively do so under applicable law, each of Debtor, Purchaser and Seller irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the in personam jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(c) Nothing in this Section 9.7 shall affect the right of Debtor, Seller or Purchaser to serve process in any manner permitted by law.

Section 9.8 **Successors and Assigns**. This Agreement shall bind and inure to the benefit of Debtor, Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns. Purchaser shall have the right to assign this Agreement to an entity to be formed for the purposes of this transaction. No assignment of Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement or give rise to any right of Purchaser (or its assignee) to delay the Closing. This Agreement is solely for the benefit of Debtor, Seller and Purchaser; there are no third-party beneficiaries hereof. Any assignment or transfer in violation of the foregoing provisions shall be null and void.

Section 9.9    **Invalid Provision**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement; and this Agreement shall be construed so as to create or provide for, to the fullest extent permitted by law, the same rights and obligations as this Agreement would have created or provided for had such term or provisions been legal, valid and enforceable.

Section 9.10    **Attorneys' Fees**.  If either party hereto files suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover from the non-prevailing party, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees incurred in such suit.  The provisions of this Section 9.10 shall survive the Closing or termination of this Agreement.

Section 9.11    **Multiple Counterparts; Electronic Signatures**.  This Agreement may be executed in any number of identical counterparts which, taken together, shall constitute collectively one agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.  Electronic or facsimile signatures (including signatures delivered via electronic mail in PDF format) shall be deemed to be originals and shall be valid and enforceable to the same extent as original signatures.

Section 9.12    **No Recordation**.  Debtor, Seller and Purchaser hereby acknowledge that, except for a Notice of Settlement filed by the Title Company, neither this Agreement nor any memorandum or affidavit thereof shall be recorded in the County of Richmond or any other county.

Section 9.13    **Merger Provision**.  Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Debtor of any representation, warranty or covenant contained in this Agreement shall merge with the Assignment and Assumption of Membership Interests and other instruments executed at the Closing, shall terminate at the Closing and shall not survive the Closing.

Section 9.14    **Jury Waiver**.  DEBTOR, PURCHASER AND SELLER DO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY PURCHASER OR DEBTOR AT THE CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER TO THIS AGREEMENT OR THE PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THIS WAIVER IS A MATERIAL INDUCEMENT FOR DEBTOR TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY PURCHASER AT THE CLOSING AND SHALL SURVIVE THE CLOSING OR TERMINATION OF THIS AGREEMENT.

{01137963.DOCX;3 }

Section 9.15    **Limitation on Liability**.  No present or future partner, director, officer, shareholder, direct or indirect owner, employee, privilege advisor, agent, attorney, asset manager or subasset manager of any of Debtor, Seller or Purchaser shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Purchaser and its successors and assigns and, without limitation, all other persons and entities, shall look solely to the Property and Membership Interests for the payment of any claim or for any performance, and Purchaser hereby waives any and all such personal liability.  The limitations on liability contained in this Section 9.15 are in addition to, and not in limitation of, any limitation on liability applicable to Debtor provided in any other provision of this Agreement or by law or by any other contract, agreement or instrument.

Section 9.16    **Confidentiality**.  Without limiting the terms and conditions of Section of this Agreement, Purchaser shall keep confidential and shall not disclose (including, without limitation, by press release) the terms of the transfer contemplated in this Agreement, including, without limitation, the Purchase Price and all other financial terms, without the prior written consent of Debtor except: (a) to Purchaser's actual or prospective lender and each of Purchaser's and Purchaser's lender's directors, officers, members, investors (actual or prospective), partners (actual or prospective), employees, legal counsel, accountants, engineers, architects, financial advisors and similar professionals and consultants to the extent such party deems it necessary or appropriate in connection with the transaction contemplated hereby (and Purchaser shall inform each of the foregoing parties of such party's obligations under this Section 9.16); or (b) as otherwise required by law or regulation (and in such event Purchaser shall notify Debtor thereof and reasonably cooperate with Debtor to minimize any disclosure).  This Section 9.16 shall survive the Closing or earlier termination of this Agreement.

Section 9.17    **Indemnification Generally**.

(a)    Wherever it is provided in this Agreement or in any agreement or document delivered pursuant hereto that a party shall indemnify another party hereunder against liability or damages, such phrase and words of similar import shall mean, without limitation of the applicable clause of this Agreement or such other agreement or document, that the indemnifying party hereby agrees to and does indemnify, defend and hold harmless the indemnified party and such party's direct and indirect shareholders, members and partners and their respective past, present and future officers, directors, employees and agents from and against any and all claims, damages, losses, liabilities and expenses (including, but not limited to, reasonable attorneys' fees and disbursements) to which they or any of them may become subject or which may be incurred by or asserted against any or all of them attributable to, arising out of or in connection with the matters provided for in such provision.

(b)    If any action, suit or proceeding is commenced, or if any claim, demand or assessment is asserted in respect of which a party is indemnified hereunder or under any agreement or document delivered pursuant hereto, the indemnified party shall give notice thereof to the indemnifying party and the indemnifying party shall be entitled to control the defense, compromise or settlement thereof, subject to the approval of the indemnified party, not to be unreasonably withheld or delayed, at the cost and expense of the indemnifying party, with counsel reasonably

satisfactory to the indemnified party; provided, however, that if any such compromise or settlement does not fully release the indemnified party from all claims relating to the indemnified matter, the indemnifying party shall not agree to such compromise or settlement without the prior approval of the indemnified party, which may be withheld in the indemnified party's sole and absolute discretion.

(c)     The provisions of this Section 9.17 shall survive the Closing or earlier termination of this Agreement.

[Signatures appear on the following page]

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

**SELLER:**

**SOUTH TO EAST 2021 TRUST**

By:    /s/ Pearl Schwartz_____
Name: Pearl Schwartz
Title:  Trustee

**PURCHASER:**

**VETERANS ROAD CENTER LLC**

By:    /s/ Jack Wolcowitz
Name: _____
Title: _____

**DEBTOR:**

**VETERAN HOLDINGS NY LLC**

By:    /s/ Pearl Schwartz_____
Name: Pearl Schwartz_____
Title:  Trustee, Managing Member_

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in this Agreement:

**ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**

By:    /s/ Fred B. Ringel_____
Name: Fred B. Ringel_____
Title:  Shareholder_____

**EXHIBIT D**



**Judy Minster**

https://www.linkedin.com/in/judy-minster-0645b910b

www.joylandmgmt.com

**CEO of Joyland Management**

In many ways, Judy Minster *is* Joyland Management. The firm's property manager initially worked for us several years ago, on a project supervising construction on an eight-unit property. "After putting so much effort into the construction of the building, I wanted to make sure it would be managed right. So, I stayed on. That's how Joyland Management was born." says Judy, who's taken on more responsibility with each successive year. Today her workflow includes researching potential new projects, inspecting all construction jobs, and reviewing rental applications, leases, deeds and contracts, as well as signing off on all expenses. She serves as a liaison with owners and partners, keeping apprised of their concerns, and ensuring smooth interactions.  She also handles all of the arduous and irksome aspects of management, i.e., Refinance, Foreclosures, Evictions, Violations, Annual Filings and numerous additional components of the business.

Joyland Management portfolio consists or Residential, Commercial and Mixed-Use Buildings.

Joyland has over 1,000 residential units and 40 Commercial tenants with an annual billing of over 25Million.

Joyland Management is proud to be a woman owned and run company.