## SECOND AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT FOR MEMBERSHIP INTERESTS IN

## VETERAN HOLDINGS NY LLC

AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT FOR MEMBERSHIP INTERESTS IN VETERAN HOLDINGS NY LLC (this "**Agreement**") is made as of the 14th day of February 2022, by and among **VETERAN HOLDINGS NY LLC** ("**Debtor**"), **SOUTH TO EAST 2021 TRUST** ("**Seller**"), and **VETERANS ROAD CENTER LLC**, a New York limited liability company ("**Purchaser**").

BACKGROUND

**WHEREAS**, **DEBTOR** is a debtor in possession in a chapter 11 bankruptcy case before the United States Bankruptcy Court for the Eastern District of New York ("**Bankruptcy Court**"), under Case No. 22-40052 (ESS)("**Bankruptcy Case**") filed on January 18, 2022 ("**Petition Date**"), and subject to the provisions of the United States Bankruptcy Code, 11 U.S.C. §§101 et seq. ("**Bankruptcy Code**"); and

**WHEREAS**, a CONTRACT OF SALE and FIRST AMENDMENT TO CONTRACT OF SALE (collectively, the "**Veterans Contract**") were entered into prior to the Petition Date between **VETERANS ROAD HOLDINGS LLC** as seller ("**Veterans Seller**"), and the Debtor as purchaser thereunder, covering the purchase and sale of premises known as 2925-2965 Veterans Road, West Staten Island, NY (collectively, the "**Premises**" or "**Property**"); and

**WHEREAS**, Seller is the holder of 100% of the Membership Interests of the Debtor ("**Membership Interests**"), and the Debtor shall own the Property as of Closing (as hereinafter defined); and

**WHEREAS**, the Debtor has filed a Plan of Reorganization ("**Plan**"), as may be amended, pursuant to which it will seek to assume the Veterans Contract pursuant to section 365 of the Bankruptcy Code pursuant to which it will, *inter alia,* acquire title to the Premises under its Plan and Purchaser shall contemporaneously acquire new membership interests in the Debtor for the consideration set forth in this Agreement under the terms and conditions set forth in this Agreement and in accordance with the Debtor's Plan, which Plan shall be funded by the Purchase Price (defined herein) and which Purchase Price shall be utilized to fund the Plan Funding Obligations as defined in the Plan with any excess funds over and above the amounts needed to fund the Plan Funding Obligations to be disbursed to Seller whose membership interests in the Debtor shall then be canceled; and

**WHEREAS**, subject to confirmation of the Plan, the parties are entering into this Agreement for Purchaser to acquire new membership interests in the Debtor in exchange for the

Purchase Price, as of the Effective Date of the Plan pursuant to the Plan equal to 100% of the membership interests in the Debtor; and

**WHEREAS**, as set forth in section 1.1 below, Debtor intends to cancel Seller's Membership Interests and after the distribution to Seller as provided for therein, Purchaser will own, directly, 100% of the membership interests in the Debtor which will have acquired the Property (as defined below) under the Plan; and

**NOW, THEREFORE**, in consideration of the mutual covenants and representations herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller, Debtor and Purchaser agree as follows:

# ARTICLE 1

## PURCHASE AND SALE

Section 1.1    **Purchase and Sale of Membership Interests**.  Subject to the terms and conditions of this Agreement, Debtor hereby agrees to sell, assign, transfer and convey to Purchaser and Purchaser hereby agrees to acquire from Debtor, at the price and upon and subject to the terms and conditions hereof, 100% of the Debtor's membership interests as follows:

In order to effectuate the transactions contemplated by this Agreement, it is agreed to and understood by the Parties that Purchaser shall fund the Purchase Price for the ~~new~~ membership interests in the Debtor which Purchase Price shall be paid into the Debtor's estate and utilized for the Debtor's acquisition of the Property and to pay the Plan Funding Obligations. Seller agrees to and has transferred one (1%) percent of its membership interests to Purchaser, in exchange for the Downpayment, which transfer is contingent upon the occurrence of the Closing Date as defined in Article 5. In the event the Closing Date does not occur for any reason, the one (1%) membership interest shall be deemed transferred back to Seller without any further action by Seller.

Any ~~excess~~ funds remaining in the Debtor's estate after payment is made in full to satisfy the Plan Funding Obligations shall be distributed to Seller, at which time ~~Seller's~~ the remaining 99% membership interests in the Debtor held by the Seller shall be canceled and Purchaser shall be ~~the 100% owner of the~~ issued new membership interests in the Debtor so that Purchaser holds 100% of the Membership Interests in the Debtor as of the Closing Date.

Section 1.2    **Property**.  By acquiring the membership interests, Purchaser shall acquire all of Seller's indirect right, title and interest in and to the following described property (herein collectively, the "**Property**") which shall be acquired in the name of the Debtor upon assumption of the Contract and the Closing contemplated thereunder and upon confirmation of the Debtor's Plan:

(a)    **Land**.  That certain parcel or parcels of land (the "**Land**") commonly known as 2925-2965 Veterans Road, West Staten Island, NY (the "**Land**").

(b)     **Improvements**. All buildings and improvements and all air and development rights (the "**Improvements**") in and on the Land, together with all other rights ancillary thereto, and other property thereon. The Improvements, Premises, Property,  and the Land are collectively referred to in this Agreement as the "**Real Property**".

(c)     **Tenant Leases**.  All leases and licenses of space in the Improvements, and all occupancy agreements with respect to space in the Improvements (including amendments, modifications and guarantees in connection therewith, collectively, the "**Tenant Leases**"), and all tenant security deposits under the Tenant Leases (whether cash or in the form of a letter of credit or otherwise) held by Debtor and or Fee Owner on the date hereof (the "**Security Deposits**") and all arrearages of rent as of the Closing Date.

(d)     **Tangible Personal Property**.   All appliances, fixtures, equipment, machinery, furniture, carpet, drapes and other personal property (including plans and specifications, permits and approvals, to the extent assignable), if any, owned or leased by Debtor and located on the Land and the Improvements and used solely in connection therewith (the "**Tangible Personal Property**"); provided that it is expressly agreed by the parties hereto that none of the Tangible Personal Property in, on, around or affixed on or about the Land and the Improvements owned by any party other than Debtor (including, without limitation, by any tenant under a Tenant Lease ("**Tenant**")) shall be or be deemed included in the Property (and shall not be sold pursuant hereto).

(e)     **Contracts**.  To the extent assignable without the consent of third parties and to the extent assumed pursuant to the terms hereof, the Service Contracts.

(f)     **Intangible Property**.  To the extent assignable without the consent of third parties, all intangible property, including, without limitation, the name "American Metro Center" and logos for the American Metro Center, if any (the "**Intangible Property**" together with the Tangible Personal Property (the "**Personal Property**")), if any, owned by Debtor and relating solely to the Land, the Improvements or the Tangible Personal Property (subject to the proviso in Section 1.2(d) of this Agreement).

## ARTICLE 2

## PURCHASE PRICE

Section 2.1     **Purchase Price**.   The purchase price (the "**Purchase Price**") for the Membership Interests shall be **FIFTY-NINE MILLION AND 00/100 DOLLARS ($59,000,000.00)** and shall be paid as follows:

(a)     **Downpayment**. Purchaser has funded an initial deposit of **FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000.00)**, the "**Initial Downpayment**") to **ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**, as escrow agent (the "**Escrow Agent**") by wire transfer of immediately available federal funds.  On or before 5PM EST of February 21, 2022, Purchaser shall make an additional deposit of **ONE MILLION AND 00/100 DOLLARS ($1,000,000.00)** to Escrow Agent (the "**Second Downpayment**" and along with the Initial Downpayment collectively referred to herein as the

"**Downpayment**"). The Downpayment shall be held by Escrow Agent in accordance with Article 3 hereof.

(b)    **Independent Consideration**.  The parties hereby acknowledge and agree that a portion of the Downpayment equal to $1,000 (the "**Independent Consideration**") constitutes a payment by Purchaser to Debtor which has been bargained for and agreed to as consideration for Debtor's execution and delivery of this Agreement.  The Independent Consideration is non-refundable in all events, and any return of the Downpayment to Purchaser as expressly provided herein shall be made after deducting the Independent Consideration and paying such Independent Consideration to Debtor.  Notwithstanding the foregoing, the Independent Consideration shall be deemed part of the Downpayment for purposes of crediting the same against the Purchase Price payable by Purchaser at Closing.

(c)    **Closing Payment**.  At the Closing, **FIFTY-SEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($57,500,000.00)**, representing the balance of the Purchase Price, adjusted as hereinafter provided, shall be paid by wire transfer of immediately available federal funds, to accounts specified in writing by Debtor at a bank or banks designated by Debtor.

## ARTICLE 3

## DOWNPAYMENT IN ESCROW

Section 3.1    **Downpayment in Escrow**.  Purchaser shall deliver the Downpayment to Escrow Agent to be held in escrow by Escrow Agent on the following terms and conditions:

(a)    The Downpayment shall be deposited in a non-interest bearing account.

(b)    Escrow Agent shall deliver the Downpayment to Debtor, Seller or to Purchaser, as the case may be, upon the following conditions, subject to Bankruptcy Court approval:

(i)    to Debtor, at the Closing;

(ii)    to Debtor, as liquidated damages upon receipt of written demand therefor signed by Debtor, stating that Purchaser has defaulted in the performance of its obligations under this Agreement and Debtor has terminated this Agreement on account of said default of Purchaser (it being agreed by Purchaser that the Downpayment is a fair and reasonable estimate of Debtor's damages and is not a penalty); provided, however, that Escrow Agent shall not honor such demand until at least five (5) business days after the date on which Escrow Agent shall have delivered a copy of such demand to Purchaser, nor thereafter if during such five (5) business day period Escrow Agent shall have received written notice of objection from Purchaser in accordance with the provisions of this Section 3.1;

(iii)    to Purchaser, upon receipt of written demand therefor signed by Purchaser, stating that:  (1) this Agreement has been duly terminated in accordance with

Purchaser's rights under this Agreement and that Purchaser is entitled under this Agreement to the return of the Downpayment; or (2) Debtor has defaulted by failing to consummate the Closing and Purchaser has terminated this Agreement on account of said default of Debtor; provided, however, that Escrow Agent shall not honor such demand in either case until at least five (5) business days after the date on which Escrow Agent shall have delivered a copy of such demand to Debtor, nor thereafter if during such five (5) business day period Escrow Agent shall have received written notice of objection from Debtor in accordance with the provisions of this Section 3.1.

(c)     Upon receipt of a written demand for the Downpayment made by Purchaser Debtor pursuant to subsection (b) of this Section 3.1, Escrow Agent shall promptly deliver a copy thereof to the other party in the manner required herein.  The other party shall have the right to object to the delivery of the Downpayment by written notice of objection given within five (5) business days after Escrow Agent shall have delivered a copy of such demand to such other party, but not thereafter (time being of the essence with respect thereto).  Upon receipt of such notice of objection from the other party, Escrow Agent shall promptly deliver a copy thereof to the party who made the written demand in the manner required herein.

(d)     If: (i) Escrow Agent shall have received a notice of objection as provided for in subsection (c) of this Section 3.1 within the time therein prescribed; or (ii) any other disagreement or dispute shall arise between the parties hereto and/or any other persons resulting in adverse claims and demands being made for the Downpayment (or any part thereof), whether or not litigation has been instituted, then Escrow Agent shall refuse to comply with any claims or demands on it and continue to hold the Downpayment until Escrow Agent receives either:  (x) a written notice signed by Debtor and Purchaser directing the disbursement of the Downpayment; or (y) a final order, which is not (or is no longer) appealable, of the Bankruptcy Court, entered in a proceeding in which Debtor, Purchaser and Escrow Agent are named as parties, directing the disbursement of the Downpayment, in either of which events Escrow Agent shall then disburse the Downpayment in accordance with said direction.  Escrow Agent shall not be or become liable in any way or to any person for its refusal to comply with any such claims or demands unless and until it has received a direction of the nature described in clause (x) or clause (y) of this subsection (d).  Notwithstanding the foregoing provisions of this Section or otherwise, Escrow Agent shall have the following rights:  (1)  if Escrow Agent shall have received a written notice signed by either Debtor or Purchaser advising that a litigation between Debtor and Purchaser over entitlement to the Downpayment has been commenced, Escrow Agent may, on notice to Debtor and Purchaser, deposit the Downpayment with the clerk of the Bankruptcy Court; or (2) Escrow Agent may, on notice to Debtor and Purchaser, take such affirmative steps as it may, at its option, elect in order to terminate its duties as escrow agent, including, without limitation, the deposit of the Downpayment with the Bankruptcy Court and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Debtor or Purchaser is the losing party.

(e)     Upon the taking by Escrow Agent of any action permitted by this Section 3.1, Escrow Agent shall be released of and from all liability hereunder.  Except as otherwise expressly provided in this Section 3.1, all costs and expenses incurred by Escrow Agent in performing its duties as escrow agent, including, without limitation, reasonable attorneys' fees

(either paid to retained attorneys or amounts representing the fair value of legal services rendered to or for itself) shall be borne equally by Debtor and Purchaser.

(f)        Escrow Agent is to act hereunder as a depository only and is not responsible or liable in any manner whatsoever for: (i) the sufficiency, correctness, genuineness, collection or validity of any instrument deposited with it; (ii) the form of execution of such instruments; (iii) the identity, authority or rights of any person executing or depositing the same; (iv) the terms and conditions of any instrument pursuant to which the parties may act; or (v) the loss of the Downpayment or any interest (due to early presentation for payment, insolvency of the bank in which any portion of the Downpayment is placed or otherwise).

(g)        Escrow Agent shall not have any duties or responsibilities except those set forth in this Section 3.1, and shall not incur any liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper or document believed by Escrow Agent in good faith to be genuine, and Escrow Agent may assume that any person purporting to give it any notice on behalf of any party in accordance with the provisions hereof has been duly authorized to do so.  Notwithstanding the foregoing, in order to avoid fraud or other errors, prior to initiating any wire Escrow Agent shall confirm the wire instructions telephonically with the intended recipient, including all supplemental, conflicting or replacement wire instructions.

(h)        Except to the extent that Escrow Agent shall have been guilty of gross negligence or willful misconduct, Debtor and Purchaser, jointly and severally, agree to defend, indemnify and hold harmless Escrow Agent and its partners and employees from and against any liability whatsoever, and shall promptly pay or reimburse Escrow Agent for all out-of-pocket costs and expenses, including any court costs and reasonable attorneys' fees and disbursements, incurred by it in connection with its performance hereunder.  Escrow Agent shall have no liability hereunder except to the extent that Escrow Agent shall have been found guilty of gross negligence or willful misconduct.

(i)        The terms and provisions of this Section 3.1 shall create no right in any person, firm or corporation other than the parties hereto and their respective successors and assigns, and no third party shall have the right to enforce or benefit from the terms hereof.

(j)        Escrow Agent shall be responsible for the timely filing of any reports or returns required pursuant to the provisions of Section 6045(e) of the Internal Revenue Code of 1986 (and any similar reports or returns required under any state or local laws) in connection with the transactions contemplated by this Agreement.

(k)        Escrow Agent has executed this Agreement for the sole purpose of agreeing to act as such in accordance with the terms of this Section.

## ARTICLE 4

## ACCESS, REPRESENTATIONS AND WARRANTIES

Section 4.1        **Title to the Membership Interests**. The Membership Interests shall be delivered free and clear of any liens and/or encumbrances.

Section 4.2    **Access to the Property.**

(a)    Debtor shall co-operate with Purchaser in causing the Veterans Seller to provide access to the Improvements for the purpose of, examining the same in anticipation of its acquisition of the Membership Interests in the Debtor and, in the case of any such entry, Purchaser shall: (i) in all events give at least twenty-four (24) hours' advance notice to Debtor so that Debtor may use its best efforts to arrange for such access and, at their option, have a representative present during each visit to the Property; (ii) not contact or otherwise communicate with any person using, occupying or providing service at the Property, including without limitation, any Tenant, without Debtor's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed, and the right of access herein granted is specifically subject to the rights of Tenants under the Tenant Leases; and (iii) not interfere with the use or operation of the Property. If Purchaser desires access to any space occupied by a Tenant, Debtor shall seek to arrange such entry, but any access to space occupied pursuant to a Tenant Lease shall be subject to and limited by the terms of the applicable Tenant Lease. Any such access shall be limited to normal business hours and Purchaser shall cooperate with any reasonable request by Debtor or the Veterans Seller in connection with the timing of any such access. Notwithstanding the foregoing, no invasive, intrusive or destructive inspection, testing or soil investigations shall be performed by Purchaser or its representatives or third-party contractors but Debtor, with the consent of the Veterans Seller, may permit Purchaser to perform a "Phase 1" environmental assessment. Purchaser specifically acknowledges and agrees not to utilize any such access for marketing of all or any part of the Property prior to the Closing. In the event Purchaser obtains information or discovers a preexisting condition, or state of repair or disrepair, at the Property, Purchaser hereby covenants that it shall not disclose such condition to any person unless Purchaser is required to disclose the discovery of such existing conditions to such person or to a governmental authority pursuant to applicable law (and Purchaser shall promptly notify Debtor of such pending disclosure prior to disclosure thereof and provide Debtor an opportunity to minimize such disclosure, to the extent permitted by applicable law). Prior to Purchaser's entry on the Property, Purchaser shall furnish (or caused to be furnished) to the Debtor a certificate naming the Debtor, the Seller (and its property manager and lender, but only if the Debtor and Seller make such information available to Purchaser) as additional insureds on Purchaser's or its agent's commercial general liability insurance policy with a company having a BEST rating of A:IX in an amount of at least Two Million Dollars ($2,000,000) per occurrence. Purchaser agrees to maintain such coverage for so long as this Agreement remains in effect.

(b)    The results of any such inspection (whether evidencing latent or patent defects in the Property or the existence or nonexistence of hazardous materials), or any information or matter discovered by Purchaser relating to the Tenants or the Tenant Leases, economic projections or market studies concerning the Debtor, the Membership Interests, the Property, any development rights, taxes, bonds, covenants, conditions and restrictions affecting the Property, air quality, the utilities serving the Property, any zoning, environmental or building laws, rules or regulations affecting the Property or Membership Interests, the use or occupancy of the Property or any part thereof, the suitability of the Property as the subject of a cooperative or condominium conversion, or otherwise disclosing a condition which is undesirable or in violation of any law or governmental rule, regulation, ordinance or order shall not be grounds for any modification of the respective obligations of Debtor and Purchaser hereunder or for any

amendment or modification of this Agreement.  In no event may Purchaser elect to purchase the Property separate from the Membership Interests.

(c)     All: (i) information or materials provided by Debtor to Purchaser; (ii) materials and analyses, compilations, studies or other documents or records prepared by Purchaser or its members, directors, officers, employees, agents, contractors, representatives, affiliates, actual or prospective lenders, accountants, counsel, professional advisers, actual or prospective partners or actual or prospective joint venturers (collectively, the "**Purchaser Representatives**") to the extent such analyses, compilations, studies or other documents or records contain or otherwise reflect or are generated from such information or materials provided by Debtor; and (iii) information obtained by Purchaser relating to the Property in writing from third parties in the course of Purchaser's review, including, without limitation, any environmental assessment or audit (all of the items identified in clauses (ii) and (iii) hereof being hereinafter sometimes collectively referred to as the "**Reports**" and all of the items identified in clauses (i), (ii) and (iii) hereof being hereinafter sometimes collectively referred to as the "**Information**") shall be treated as confidential information by Purchaser.  Purchaser hereby agrees that the Information shall be used solely for the purpose of evaluating the transactions contemplated by this Agreement, and Purchaser shall not disclose or distribute, either orally or in writing, or otherwise duplicate or make available, any of the Information except to Purchaser Representatives for purposes of evaluating the transactions contemplated by this Agreement, and Purchaser shall instruct all Purchaser Representatives as to the confidentiality of all such information.  Upon the termination of this Agreement, Purchaser shall, as directed by Debtor, either promptly destroy all Information (including all originals and copies thereof) or promptly return all Information (including all originals and copies thereof) to Debtor.  This Section 4.2(c) shall survive the termination of this Agreement.

(d)     At Debtor's request, Purchaser agrees to deliver to such Debtor copies of all of the Reports when Purchaser first receives the same.  Purchaser's obligation to deliver the Reports to Debtor shall survive the termination of this Agreement for a period of 20 days.

Section 4.3     **Purchaser's Representations and Warranties**.  Purchaser represents and warrants to Debtor that:

(a)     **Authorization**.  Purchaser is a New York limited liability company, duly organized, validly existing and in good standing under the laws of the State of New York and qualified to do business in the State of Florida and has the requisite power and authority to enter into, execute and deliver this Agreement and to perform all duties and obligations imposed upon it hereunder, and Purchaser has obtained all necessary limited liability company authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and has obtained the consent of all entities and parties necessary to bind Purchaser to this Agreement.  This Agreement is valid, binding and enforceable against Purchaser.

(b)     **No Conflicts**.  Neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of: (i) any organizational documents of Purchaser; (ii) any of the terms, conditions or provisions of any agreement or instrument to which Purchaser, or any member of Purchaser is a

party or by which Purchaser, any related entity or affiliate of Purchaser or any of Purchaser's assets is bound; or (iii) any judgment, order, injunction, decree, regulation or ruling of any court or governmental entity in force as of the date hereof or as of the date of Closing.

(c)    **ERISA**.  With respect to each source of funds to be used by Purchaser to purchase the Membership Interests (respectively a "**Source**"), at least one of the following statements shall be accurate as of the Closing Date: (i) the Source does not include the assets of: (x) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), which is subject to Title I of ERISA: or (y) a "plan" as defined in Section 4975(a) of the Internal Revenue Code of 1986, as amended ("**Code**"); or (ii) the Source includes the assets of: (x) an "employee benefit plan" as defined in Section 3(3) of ERISA; or (y) a "plan" as defined in Section 4975 of the Code (each of which has been identified to Debtor in writing pursuant to this Section 4.3(c) at least five (5) business days prior to the Closing Date), but the use of such Source to purchase the Membership Interests will not result in a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

(d)    **No Litigation**.  There are no legal actions, suits or similar proceedings pending against Purchaser, to Purchaser's knowledge, which if adversely determined, would adversely affect Purchaser's ability to consummate the transactions contemplated by this Agreement.

(e)    **Bankruptcy**.  Purchaser has not: (i) commenced a voluntary case, or had entered against it a petition, for relief under the federal bankruptcy code or any similar petition, order or decree under any federal or state law or statute relative to bankruptcy, insolvency or other relief for debtors; (ii) caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceedings, to hold, administer and/or liquidate all or any of its property; or (iii) made an assignment for the benefit of creditors.

(f)    **Compliance with International Trade Control Laws and OFAC Regulations**.    Neither Purchaser nor any Person (as defined below) who owns an interest in Purchaser (collectively, a "**Purchaser Party**") is now nor at any time prior to or at the Closing will be, an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "**Person**") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "**U.S. Person**") including, without limitation, a "financial institution" as defined in 31 U.S.C. 5312 (a)(z), as periodically amended ("**Financial Institution**"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders or lists published by the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC) or otherwise.

{01137963.DOCX;35 }

(g)    **Purchaser's Funds**.  Purchaser has taken, and shall continue to take until the Closing, such measures as are required by applicable law to ensure that the funds used to pay to the Debtor the Purchase Price are derived: (i) from transactions that do not violate United States law and, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(h)    **Anti-Money Laundering Laws**.  Neither Purchaser nor any Purchaser Party, nor any Person providing funds to Purchaser: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti Money Laundering Laws (as hereinafter defined in this Section); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws.  For purposes of this Subsection (h), the term "**Anti-Money Laundering Laws**" shall mean all applicable laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "**Patriot Act**"), the Bank Secrecy Act of 1970, as amended, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

(i)    **Purchaser Compliance with Patriot Act**.  Purchaser is in compliance with any and all applicable provisions of the Patriot Act.

(j)    **Cooperation with Debtor**.  For a period of two (2) years after the Closing Date, Purchaser agrees to cooperate with Debtor, and to cause each Purchaser Party to cooperate with Debtor, in providing such additional information and documentation on Purchaser's and each Purchaser Party's legal or beneficial ownership, policies, procedures (to the extent required by applicable laws) and sources of funds as Debtor deem reasonably necessary or prudent to enable Debtor to comply with OFAC, the Patriot Act and Anti-Money Laundering Laws now in existence or hereafter enacted or amended.

Purchaser's representations, warranties and agreements set forth in this Agreement shall survive the Closing or termination of this Agreement for ~~the Survival Period (hereinafter defined~~a period of twelve (12 ) months.  Purchaser hereby acknowledges and agrees that it is a requirement of this Agreement and a condition to each Debtor's obligations hereunder that all of Purchaser's representations and warranties contained herein shall be true and correct on the date hereof and remain true and correct through and including the Closing Date, and that any material inaccuracy in Purchaser's representations and warranties and/or Purchaser's failure

{01137963.DOCX;~~3~~5 }

to notify Debtor prior to the Closing Date of any inaccuracies therein shall be defaults by Purchaser under this Agreement.

Section 4.4    **Debtor Representations and Warranties**.    Except as set forth below, Debtor represents and warrants to Purchaser on the date hereof and as of Closing that:

(a)    **Authorizations**.

(i)    Debtor represents and warrants to Purchaser that it is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New York, and, subject to Bankruptcy Court approval, has the requisite power and authority to enter into and deliver this Agreement and, subject to Bankruptcy Court approval, has, or will have by Closing, the requisite power and authority to perform all duties and obligations imposed upon it hereunder, and has obtained all necessary corporate authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and to bind Debtor to this Agreement. Upon entry of the Confirmation Order, this Agreement is valid, binding and enforceable against Debtor.

(b)    Membership Interests.

(i)    The Membership Interests constitute all of the issued and outstanding equity securities of Debtor. The Membership Interests have been duly authorized and are validly issued, fully paid and nonassessable and have not been issued and were not issued in violation of any preemptive or other similar right. There are no subscriptions, options, warrants, calls, commitments, preemptive rights or other rights of any kind (absolute, contingent or otherwise) relating to the issuance, purchase or receipt of, nor are there any equity securities or equity interests or instruments of any kind convertible into or exchangeable for, any equity securities or interests (including outstanding, authorized but unissued, unauthorized, treasury or other interests thereof) or other equity interest or any debt security or instrument of Debtor.    There are no outstanding or authorized membership interest appreciation, phantom interests, profit participation or other equity based compensation or similar rights with respect to Debtor, and there are no restrictions upon, or voting trusts, proxies or other agreements or understandings of any kind with respect to, the voting, purchase redemption, acquisition or transfer of, or the declaration or payment of an dividend or distribution on, the equity interest of Debtor.

(ii)    Debtor and Seller have or will at Closing have good and valid title to, and hold of record and own beneficially, the Membership Interests and have marketable and insurable fee simple title to the Property via its ownership structure as set forth in the Recitals herein, which Recitals are true and correct.    On the Closing Date, upon the payment of the Purchase Price and the satisfaction in full of all obligations and conditions precedent to Closing as set forth herein, Debtor will transfer title to the Membership Interests to Purchaser, and Purchaser will be entitled to all rights of a holder of the Membership Interests.    Debtor has the right to issue Membership Interests to the Purchaser, as contemplated hereby and, other than this Agreement, Debtor is not party to

any option, warrant, purchase right or other contract or commitment that could require Debtor to sell, transfer or otherwise dispose of the Membership Interests.

(c)    **No Conflicts**.  Neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of: (i) any organizational documents of each Debtor; (ii) any of the terms, conditions or provisions of any agreement or instrument to which each Debtor, or any direct member of each Debtor is a party or by which each Debtor or any of each Debtor's assets is bound; or (iii) any judgment, order, injunction, decree, regulation or ruling of any court or governmental entity.

(d)    **Litigation**.  There are no legal actions, suits or similar proceedings pending against Debtor, or to Debtor's knowledge, threatened in writing against Debtor, which if adversely determined, would materially and adversely affect each Debtor's ability to convey the Membership Interests in accordance with the terms hereof.

(e)    **FIRPTA**.  Debtor is not a "foreign person" or "foreign corporation" as those terms are defined in the Code and the regulations promulgated thereunder.

(f)    Intentionally Omitted.

(g)    **Debtor's Compliance with Patriot Act**.  To Debtor's knowledge, such Debtor has not violated any applicable provision of the Patriot Act.

(h)    **Compliance with Laws**.  Debtor represents and warrants to Purchaser that, as of the date hereof, it has received no written notice of any violation of law that has not been resolved in accordance with applicable law.

(i)    Debtor has not entered into and shall not enter into any solar power purchase agreements or similar instruments relating to the Property.

(j)    To the best of Debtor's knowledge, no person, firm or corporation or other entity has any right or option to acquire the subject Property or any portion thereof or any interest therein.

Section 4.5    **Certain Limitations on Each Debtor's Representations and Warranties**.  The representations and warranties of Debtor set forth in this Agreement are subject to the following express limitations:

(a)    **Tenant Leases and Service Contracts**.  Neither Debtor nor any other party represents or warrants that: (i) any particular Tenant Lease or Service Contract will be in force or effect as of the Closing; or (ii) the Tenants and the counter-parties to the Service Contracts will not be in default under their respective Tenant Leases or Service Contracts as of the Closing Date.  The termination or expiration of any Tenant Lease or Service Contract or a default by a Tenant or service provider under any Tenant Lease or Service Contract, respectively, shall not affect the obligation of Purchaser under this Agreement.

(b) **Documents and Materials**.  To the extent Debtor has delivered or made available to Purchaser copies of those certain documents and other materials specifically identified and scheduled on the Exhibits attached to this Agreement and such documents and other materials contain provisions inconsistent with the representations and warranties made herein, then such representations and warranties shall be deemed modified to conform them to the provisions of such documents and materials.

~~Section 4.6    Section 4.7    **Survival of Representations and Warranties; Specific Limitation**.  The representations and warranties of Debtor set forth in this Agreement and/or in any document delivered by Debtor at Closing (including, without limitation, any Landlord Estoppel Certificate) shall survive the Closing for a period of twelve (12) months (the "**Survival Period**").~~

Section 4.6    ~~Section 4.8~~ **Disclaimers.**

(a) **General and Specific Disclaimers**. PURCHASER ACKNOWLEDGES AND AGREES THAT EXCEPT AS SET FORTH HEREIN OR IN THE DOCUMENTS DELIVERED AT CLOSING, SELLER AND DEBTOR (COLLECTIVELY, THE "**SELLER PARTIES**") HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO: (I) THE VALUE, NATURE, QUALITY OR,  EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY; (II) THE INCOME TO BE DERIVED FROM THE PROPERTY; (III) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON; (IV) EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (V) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (VI) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (VII) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; OR (VIII) EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS; OR ANY OTHER MATTER WITH RESPECT TO THE PROPERTY.  ADDITIONALLY, NO PERSON ACTING ON BEHALF OF THE SELLER PARTIES IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF THE SELLER

PARTIES SHALL BE VALID OR BINDING UPON ANY OF THE SELLER PARTIES UNLESS EXPRESSLY SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY THE SELLER PARTIES AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST THE SELLER PARTIES (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT THE SELLER PARTIES HAVE NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKE NO REPRESENTATIONS, AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. THE SELLER PARTIES ARE NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE "AS IS" AND WITH ALL FAULTS (INCLUDING EXPRESSLY, BUT WITHOUT LIMITATION, THOSE RELATING TO THE FAÇADE OF THE BUILDING ON THE LAND). IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE AND HOLD HARMLESS THE SELLER PARTIES FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES, EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF PURCHASER'S ACQUISITION, OWNERSHIP, LEASING, USE, OPERATION, REPAIR, MAINTENANCE AND MANAGEMENT OF THE PROPERTY.

## ARTICLE 5

## CLOSING

Section 5.1    **Closing**.

(a)    The closing (the "**Closing**") shall take place on or before March 14, 2022, **TIME BEING OF THE ESSENCE**, at 10:00 am EST at the offices of the attorney for Veterans Seller at 235 Forest Avenue, Staten Island, NY 10301, or via mail-away escrow through the title company (this date is herein referred to as the "**Scheduled Closing Date**"; the actual date of the Closing is herein referred to as the "**Closing Date**").

(b)     Notwithstanding the foregoing, Purchaser shall be obligated to close on the Membership Interests immediately before or simultaneously with the closing contemplated under the Veterans Contract.

Section 5.2     **Possession**.  Possession of the Membership Interests shall be delivered to Purchaser at the Closing.

Section 5.3     **Intentionally Omitted**.

Section 5.4     **Closing Costs**.

(a)     **Purchaser's Costs**.   Purchaser shall pay: (i) the costs of its counsel, architects, engineers and other professionals and consultants; (ii) any and all recording and filing fees other than those, if any, relating to the satisfaction of Mandatory Liens; (iii) the costs of the Title Commitment, title insurance policy and any endorsements thereto to be issued at the Closing and one-half of Escrow Agent's fee; (iv) the cost of obtaining any survey or updated survey of the Property and any certifications thereto; (v) all costs and expenses in obtaining any financing which Purchaser may obtain in connection with its acquisition of the Membership Interests (it being understood, however, that there is no financing contingency to this transaction, and Purchaser seeks financing at its own risk); (vi) any fees, costs and expenses incurred by Purchaser and/or Debtor in connection with the assumption by Purchaser of any loan or other financing secured by the Property; and (ix) any other costs customarily paid by purchasers of membership interests.

(b)     **Seller's Costs**.  Seller shall pay: (i) the costs of its counsel and other professionals and consultants; (ii) one-half of Escrow Agent's fee, (iii) any other costs customarily paid by Seller of membership interests or as otherwise set forth in this Agreement.

(c)     **Survival**.  The provisions of this Section 5.4 shall survive the Closing.

Section 5.5     **Debtor Obligations at the Closing**. At the Closing, or at such other time as is indicated below, Debtor shall deliver to Purchaser or, at Purchaser's discretion, to the Title Company, the following (collectively, the "**Debtor Closing Documents**"):

(a)     ~~FIRPTA Certification.  A certificate in the form attached hereto as with respect to compliance with the Foreign Investment in Real Property Tax Act (Internal Revenue Code Sec. 1445, as amended, and the regulations issued thereunder).~~ New Membership Interests in the Debtor.  The membership interests in the Debtor.

(b)     ~~Intentionally Omitted.~~

(c)     ~~Intentionally Omitted.~~

(d)     ~~Keys.  To the extent in a Debtor's possession or the possession of the property manager, all keys, codes and other security devices for the Property.~~

(e)     ~~Original Documents.  To the extent available, the originals (to the extent in each Debtor's possession or the possession of the property manager) or, if originals are~~

~~unavailable, certified copies, of the Tenant Leases, the Service Contracts, and copies of plans and specifications for the Improvements, permits, licenses and other agreements and approvals relating to the maintenance and operation of the Property. In addition, Debtor or the property manager shall deliver to Purchaser copies of all Tenant files and correspondence with tenants in its possession or control and all other books, records and materials in the possession of Debtor or the property manager reasonably required for the orderly transition of operation of the Improvements.~~

> ~~(f)    Security Deposits.~~

> > ~~(i)    if any Security Deposit is being held by Debtor in immediately available funds, then, at the Closing, Debtor shall credit to the account of Purchaser the amount of such Security Deposits (to the extent such Security Deposits have not been applied in accordance with Debtor's rights under the applicable Tenant Lease); and~~

> **(b)** ~~(g)~~ Certificate of Representations and Warranties. A certification of Debtor reaffirming that all representations and warranties made by Debtor in this Agreement are true and correct as of the Closing Date in all material respects (except for those representations and warranties expressly made as of the date hereof), subject to Section 4.5 and Section 4.6 of this Agreement.

> > ~~(h)    Intentionally Omitted.~~

> > ~~(i)    Settlement Statement. A settlement statement setting forth the apportionments pursuant to the terms of this Agreement (the "**Settlement Statement**").~~

> **(c)** ~~(j)~~ Other Documents. Any other documents which Debtor is obligated to deliver to Purchaser pursuant to this Agreement or are necessary to consummate the transaction contemplated in this Agreement or reasonably requested by the Title Company, including, without limitation, a title affidavit in the form reasonably required by the Title Company.

> > ~~Location at the Improvements on the Closing Date of any of the materials referred to in Section 5.5(f) shall be deemed delivery to Purchaser. At Closing, Debtor shall also deliver to the Title Company such organizational and authorizing documents of Debtor, or a Bankruptcy Court order providing requisite authority as shall be reasonably required by the Title Company to evidence Debtor's authority to consummate the transactions contemplated by this Agreement.~~

> Section 5.6    **Purchaser's Obligations at the Closing**. At the Closing, Purchaser shall deliver to Debtor or, at each Debtor's discretion, to the Title Company, the following (collectively, the "**Purchaser's Closing Documents**"), each of which must be satisfied or waived by Debtor as a condition to each Debtor's obligation to close:

> > (a)    Purchase Price. The balance of the Purchase Price in accordance with Section 2.1.

> > (b)    Certificate of Representations and Warranties. A certificate of Purchaser certifying that the representations and warranties made by Purchaser in this Agreement are true and correct in all material respects as of the Closing Date.

{01137963.DOCX;~~3~~5 }

(c)      Transfer Tax Forms. Intentionally Omitted.

(d)      Settlement Statement.  The Settlement Statement.

(e)      Other Documents.  Any other documents which Purchaser is obligated to deliver to Debtor pursuant to this Agreement or are reasonably necessary to consummate the transaction contemplated by this Agreement.

At Closing Purchaser shall also deliver to the Title Company such organizational and authorizing documents of Purchaser as shall be reasonably required by the Title Company authorizing Purchaser's acquisition of the Membership Interests and, indirectly, the Property, pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

## ARTICLE 6

## INTENTIONALLY OMITTED

## ARTICLE 7

## DEFAULT

Section 7.1    **Breach by Debtor**.  In the event that Debtorr shall default under this Agreement for any reason except Purchaser's default or as otherwise permitted by this Agreement, Purchaser, as its sole and exclusive remedy may either: (a) terminate this Agreement and, subject to Bankruptcy Court approval, receive a refund of the Downpayment, and neither party shall have any further rights or obligations hereunder other than the Surviving Obligations; or (b) pursue the remedy of specific performance of each of Debtor's obligations under this Agreement; provided, however, that  any such suit for specific performance is filed no later than one hundred twenty (120) days after the Closing Date. ~~Notwithstanding the foregoing, in the event specific performance is not an available remedy to Purchaser due to the acts or omissions of Debtor, then Purchaser shall be entitled to pursue any and all available remedies under law and equity.  Nothing in this Section 7.1 shall be deemed to limit or inhibit Purchaser's ability to sue Debtor post-Closing for breach of Debtor's representations made herein and obtain damages in connection therewith.~~

**Breach by Purchaser**.  In the event that Purchaser shall default by failing to consummate the Closing of this Agreement in accordance with the terms hereof, for any reason except a Debtor default or as otherwise permitted by this Agreement, Debtor may terminate this Agreement and thereupon Debtor shall be entitled to the Downpayment as liquidated damages (and not as a penalty) and as Debtor's sole and exclusive remedy and relief for such default except with respect to the Surviving Obligations.  Debtor and Purchaser each acknowledge and agree that they have made this provision for liquidated damages because it would be difficult to calculate, on the date hereof, the amount of actual damages for such default, and Debtor and Purchaser agree that these sums represent reasonable compensation to Debtor for such default.

In no event whatsoever shall Purchaser be liable to Debtor for any punitive, special, consequential or other damages.

Section 7.2    **No Right to Eliminate Membership Interests**.  Purchaser acknowledges that Purchaser shall have no right to acquire less than all of the Membership Interests.

# ARTICLE 8

# **INTENTIONALLY OMITTED.**

# ARTICLE 9

# **MISCELLANEOUS**

Section 9.1    **Notices**.  All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be given (i) by hand, overnight courier or certified or registered mail, return receipt requested and shall be deemed given when received or when delivery first fails or is refused when sent to the address set forth herein, or (ii) by email (with a copy sent the same day by overnight delivery service or personal delivery), in which case notice shall be deemed given on the date sent if sent by 5:00 p.m. of the recipient's business day (otherwise it shall be deemed received on the next business day), to the appropriate address indicated below or at such other place or places as either Purchaser or Debtor may, from time to time, respectively, designate in a written notice given to the other in the manner described above. For purposes of this Section 9.1, the addresses of the parties for all notices are as follows (unless changed by similar notice in writing given by the particular person whose address is to be changed):

If to Seller:

>Abraham Neuhaus, Esq.
>The Law Office Of Abraham Neuhaus LLC
>124 Benjamin Street
>Toms River, New Jersey 08755
>Phone: (845) 548-7284
>Email: abeneuhausesq@gmail.com

If to Purchaser:    Samuel Lowinger, Esq.
>Nussbaum Lowinger LLP
>225 Broadway, 39th Floor
>New York, NY 10007
>Phone: (212) 632-8300
>Email: slowinger@nlllp.com

{01137963.DOCX;35 }

If to Escrow Agent:      Robinson Brog PC
875 Third Avenue, 9th Floor
New York, New York 10022
Attn: Fred B Ringel
Telephone: (212) 603-6301
E-Mail: fbr@robinsonbrog.com

The attorneys for each party hereto are authorized to give notices on behalf of such party.

Section 9.2    **Real Estate Commissions**. Each of Debtor and Purchaser represents and warrants to the other that it has dealt with no broker or other intermediary in connection with this transaction other than NONE (the "**Broker**"). Debtor shall pay the commissions owed to the Broker pursuant to a separate agreement. Purchaser agrees to indemnify, defend and hold harmless Debtor from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by Purchaser or on Purchaser's behalf with any broker or finder in connection with this Agreement or the transaction contemplated hereby. Debtor agrees to indemnify, defend and hold harmless Purchaser from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by Debtor or on Debtor's behalf with any broker or finder in connection with this Agreement or the transaction contemplated hereby. This Section 9.2 shall survive the Closing or any earlier termination of this Agreement.

Section 9.3    **Entire Agreement**. This Agreement embodies the entire agreement between the parties hereto relative to the subject matter hereof, and except for Purchaser's obligations and liabilities under any confidentiality agreement executed by or on behalf of Purchaser or any affiliate of Purchaser, there are no oral or written agreements between the parties hereto nor any representations made by either party relative to the subject matter hereof, which are not expressly set forth herein.

Section 9.4    **Amendment**. This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

Section 9.5    **Headings**. The captions and headings used in this Agreement are for convenience only and do not in any way limit, amplify or otherwise modify the provisions of this Agreement.

Section 9.6    **Dates and Timing**. If the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday, legal holiday under the laws of the United States or the State of New York, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday, legal holiday or Jewish holiday.

Section 9.7    **Governing Law**.

{01137963.DOCX;35 }

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to a contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof.

(b)    Debtor, Purchaser and Seller each irrevocably submit to the exclusive in personam jurisdiction of any State of New York, or Federal court sitting in the City of New York over any suit, action or proceeding arising out of or relating to this Agreement. To the fullest extent it may effectively do so under applicable law, each of Debtor, Purchaser and Seller irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the in personam jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(c)    Nothing in this Section 9.7 shall affect the right of Debtor, Seller or Purchaser to serve process in any manner permitted by law.

Section 9.8    **Successors and Assigns**.  This Agreement shall bind and inure to the benefit of Debtor, Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns. Purchaser shall have the right to assign this Agreement to an entity to be formed for the purposes of this transaction.  No assignment of Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement or give rise to any right of Purchaser (or its assignee) to delay the Closing. This Agreement is solely for the benefit of Debtor, Seller and Purchaser; there are no third-party beneficiaries hereof.  Any assignment or transfer in violation of the foregoing provisions shall be null and void.

Section 9.9    **Invalid Provision**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement; and this Agreement shall be construed so as to create or provide for, to the fullest extent permitted by law, the same rights and obligations as this Agreement would have created or provided for had such term or provisions been legal, valid and enforceable.

Section 9.10    **Attorneys' Fees**.  If either party hereto files suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover from the non-prevailing party, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees incurred in such suit.  The provisions of this Section 9.10 shall survive the Closing or termination of this Agreement.

Section 9.11    **Multiple Counterparts; Electronic Signatures**.  This Agreement may be executed in any number of identical counterparts which, taken together, shall constitute collectively one agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.  Electronic or

facsimile signatures (including signatures delivered via electronic mail in PDF format) shall be deemed to be originals and shall be valid and enforceable to the same extent as original signatures.

Section 9.12    **No Recordation**.  Debtor, Seller and Purchaser hereby acknowledge that, except for a Notice of Settlement filed by the Title Company, neither this Agreement nor any memorandum or affidavit thereof shall be recorded in the County of Richmond or any other county.

Section 9.13    **Merger Provision**.  Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Debtor of any representation, warranty or covenant contained in this Agreement shall merge with the Assignment and Assumption of Membership Interests and other instruments executed at the Closing, shall terminate at the Closing and shall not survive the Closing.

Section 9.14    **Jury Waiver**.  DEBTOR, PURCHASER AND SELLER DO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY PURCHASER OR DEBTOR AT THE CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER TO THIS AGREEMENT OR THE PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THIS WAIVER IS A MATERIAL INDUCEMENT FOR DEBTOR TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY PURCHASER AT THE CLOSING AND SHALL SURVIVE THE CLOSING OR TERMINATION OF THIS AGREEMENT.

Section 9.15    **Limitation on Liability**.  No present or future partner, director, officer, shareholder, direct or indirect owner, employee, advisor, agent, attorney, asset manager or subasset manager of any of Debtor, Seller or Purchaser shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Purchaser and its successors and assigns and, without limitation, all other persons and entities, shall look solely to the Property and Membership Interests for the payment of any claim or for any performance, and Purchaser hereby waives any and all such personal liability.  The limitations on liability contained in this Section 9.15 are in addition to, and not in limitation of, any limitation on liability applicable to Debtor provided in any other provision of this Agreement or by law or by any other contract, agreement or instrument.

Section 9.16    **Confidentiality**.  Without limiting the terms and conditions of Section ▮ of this Agreement, Purchaser shall keep confidential and shall not disclose (including, without limitation, by press release) the terms of the transfer contemplated in this Agreement, including, without limitation, the Purchase Price and all other financial terms, without the prior

written consent of Debtor except: (a) to Purchaser's actual or prospective lender and each of Purchaser's and Purchaser's lender's directors, officers, members, investors (actual or prospective), partners (actual or prospective), employees, legal counsel, accountants, engineers, architects, financial advisors and similar professionals and consultants to the extent such party deems it necessary or appropriate in connection with the transaction contemplated hereby (and Purchaser shall inform each of the foregoing parties of such party's obligations under this Section 9.16); or (b) as otherwise required by law or regulation (and in such event Purchaser shall notify Debtor thereof and reasonably cooperate with Debtor to minimize any disclosure). This Section 9.16 shall survive the Closing or earlier termination of this Agreement.

Section 9.17   **Indemnification Generally**.

(a)    Wherever it is provided in this Agreement or in any agreement or document delivered pursuant hereto that a party shall indemnify another party hereunder against liability or damages, such phrase and words of similar import shall mean, without limitation of the applicable clause of this Agreement or such other agreement or document, that the indemnifying party hereby agrees to and does indemnify, defend and hold harmless the indemnified party and such party's direct and indirect shareholders, members and partners and their respective past, present and future officers, directors, employees and agents from and against any and all claims, damages, losses, liabilities and expenses (including, but not limited to, reasonable attorneys' fees and disbursements) to which they or any of them may become subject or which may be incurred by or asserted against any or all of them attributable to, arising out of or in connection with the matters provided for in such provision.

(b)    If any action, suit or proceeding is commenced, or if any claim, demand or assessment is asserted in respect of which a party is indemnified hereunder or under any agreement or document delivered pursuant hereto, the indemnified party shall give notice thereof to the indemnifying party and the indemnifying party shall be entitled to control the defense, compromise or settlement thereof, subject to the approval of the indemnified party, not to be unreasonably withheld or delayed, at the cost and expense of the indemnifying party, with counsel reasonably satisfactory to the indemnified party; provided, however, that if any such compromise or settlement does not fully release the indemnified party from all claims relating to the indemnified matter, the indemnifying party shall not agree to such compromise or settlement without the prior approval of the indemnified party, which may be withheld in the indemnified party's sole and absolute discretion.

(c)    The provisions of this Section 9.17 shall survive the Closing or earlier termination of this Agreement.

[Signatures appear on the following page]

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

**SELLER:**

**SOUTH TO EAST 2021 TRUST**

By:    /s/ Pearl Schwartz
Name: Pearl Schwartz
Title:   Trustee

**PURCHASER:**

**VETERANS ROAD CENTER LLC**

By:    /s/ _____
Name: Jack Wolcowitz
Name: _____
Title: Member _____

**DEBTOR:**

**VETERAN HOLDINGS NY LLC**

By:    /s/ Pearl Schwartz _____
Name: Pearl Schwartz
Title: Trustee, Managing Member _

**SELLER:**

**SOUTH TO EAST 2021 TRUST**

By: _____
Name: Pearl Schwartz
Title:   Trustee

The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth in this Agreement:

**ROBINSON BROG LEINWAND GREENE**

**GENOVESE & GLUCK P.C.**

By: ~~/s/ Fred B. Ringel~~_____

Name: Fred B. Ringel_____

Title: Shareholder_____

Document comparison by Workshare 10.0 on Wednesday, February 16, 2022
2:15:24 PM

| Input: | |
|---|---|
| Document 1 ID | file://\\app01v\docs\CLIDOCS\104423\0000\~VER\3\01137963.DOCX |
| Description | 01137963 |
| Document 2 ID | file://\\app01v\docs\CLIDOCS\104423\0000\01137963.DOCX |
| Description | 01137963 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 29 |
| Deletions | 46 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 75 |